IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SABRINA C. CATO
*Plaintiff,*

v.

Civil No. ELH-25-3703

MISSION ROCK RESIDENTIAL, LLC,

*Defendant.*

**MEMORANDUM OPINION**

Plaintiff Sabrina C. Cato, an African American transgender woman, asserts a host of discrimination claims against her former employer, Mission Rock Residential, LLC ("Mission Rock"),[1] defendant. ECF 2 (the "Complaint").[2] The claims are predicated on Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000-3 *et seq.* ("Title VII"), and the Maryland Fair Employment Practices Act ("MFEPA"), § 20-601 *et seq.* of the State Government Article ("S.G.").

In particular, Count I alleges discrimination on the basis of race, sex, gender, and sexual orientation, in violation of Title VII. ECF 2, ¶¶ 32–43. Count III asserts discrimination on the same bases, in violation of MFEPA. *Id.* ¶¶ 53–62. Count II asserts retaliation, in violation of Title VII. *Id.* ¶¶ 44–52. And, Count IV asserts retaliation under MFEPA. *Id.* ¶¶ 63–69. Cato seeks declaratory and injunctive relief as well as compensatory damages and attorneys' fees. *Id.* at 1.[3]

---

[1] Defendant claims that plaintiff "improperly" refers to it as "Mission Rock Residential, LLC d/b/a The Tala at Washington Hills." ECF 9 at 1 n.1. According to defendant, the "proper name is Mission Rock Residential, LLC." *Id.* I will adopt defendant's nomenclature.

[2] Plaintiff filed suit in the Circuit Court for Baltimore City on September 10, 2025. ECF 2. Defendant timely removed the suit pursuant to 28 U.S.C. §§ 1332, 1441. ECF 1.

[3] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

Defendant has moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 9.  The motion is supported by a memorandum (ECF 9-1) (collectively, the "Motion") and an exhibit (ECF 9-2).  In sum, defendant claims that Cato fails to state a claim for retaliation, discrimination, and hostile work environment; Cato's claims are untimely; and Cato has failed to exhaust her administrative remedies with respect to some of her claims.  *See generally* ECF 9-1. Plaintiff opposes the Motion. ECF 14 (the "Opposition").   Defendant replied.   ECF 17 (the "Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion, without prejudice, and with leave to amend.

## I.    Factual Background[4]

As noted, Cato is an African American transgender woman.  ECF 2, ¶ 3.  She is also a member of the LGBTQ+ community.  *Id.*; *see* ECF 9-2 at 2. Plaintiff does not describe defendant or its business, but merely asserts the location of "Defendant The Tala."  ECF 2, ¶ 4.  It appears that Tala is an apartment building.

On April 22, 2022, Cato began working for defendant as a "Leasing Consultant."  *Id.* ¶ 5. "As a benefit of employment," defendant provided Cato "with an apartment on the property" and discounted her rent.  *Id.*  Cato claims that she "performed her job in an exceptional manner and was commended for her performance and reliability."  *Id.*

Property Manager Jodian Hamilton was Cato's "direct supervisor."  *Id.* ¶ 6.  Jane Flynn, a white female, was the "Regional Manager."  *Id.*  Plaintiff claims that during her employment, she

---

[4] As discussed, *infra,* at this juncture I must assume the truth of the facts alleged in the suit. *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019).  Therefore, the factual summary is derived largely from the Complaint and certain exhibits, as discussed *infra*.

"was subjected to discriminatory, harassing, and retaliatory treatment based on her race, gender identity, and sexual orientation" by both Hamilton and Flynn. *Id.* ¶ 7.

According to plaintiff, "from the end of August 2023, to the beginning of November 2023, Ms. Hamilton repeatedly used aggressive and hostile language toward Plaintiff, including in email communications." *Id.* ¶ 8. And, "[i]n June 2023, during pride month, Ms. Hamilton, who is from Jamaica told Plaintiff that in her country, [Cato's] lifestyle was considered sinful, and she was 'going to hell' for her 'lifestyle,' referring to her gender identity and sexual orientation." *Id.* ¶ 9. On or about September 13, 2023, Cato and Flynn "went out to a restaurant that is connected to the office." *Id.* ¶ 10. There, Flynn "asked Plaintiff whether she was 'ghetto,' a racially charged term, and questioned if she took offense to the term." *Id.* Flynn also stated "that the company does not tolerate 'ghetto people'." *Id.*

Six days later, during a meeting on September 19, 2023, "Hamilton admonished Plaintiff in front of her colleagues, telling her: 'Sabrina, sit upright and stop rocking off your chair', although Plaintiff was engaged in the meeting." *Id.* ¶ 11. Cato "reported the racist comments to the owner of the property, Mr. Andy Tsangarides, and HR[5] Manager Carolyn Reynolds, but no corrective action was taken." *Id.* ¶ 12. Then, on September 29, 2023, "Hamilton mocked Plaintiff for smiling, stating: 'why do you have a goofy smile on your face?'" *Id.* ¶ 13. Cato responded, "'I don't have a response to that'", to which Hamilton stated: "'I can't look at you in your face' and refused to make eye contact with plaintiff." *Id.* The Assistant Property Manager, Natalia Crenny, "began laughing, making Plaintiff feel bullied for having a positive face." *Id.*

---

[5] The Court assumes that HR is an abbreviation for "human resources", although plaintiff does not define the term in her Complaint. *See HR,* MERRIAM-WEBSTER DICTIONARY, https://perma.cc/F8WW-TVMF (last accessed May 21, 2026).

Plaintiff claims that Hamilton and Ms. Crenny "monitored Plaintiff's Instagram account, attempting to find content to use against her." *Id.* ¶ 14. Cato also claims that she "was disciplined for posting on Instagram, despite other employees doing so without consequence." *Id.* Plaintiff claims that "Mr. Crenny,"[6] marked up her emails "in red ink," which plaintiff "reasonably perceived" as a "tactic" of "intimidation." *Id.*

According to plaintiff, when she "requested assistance with work-related matters, Ms. Hamilton and Ms. Crenny frequently responded in a rude and confrontational manner." *Id.* ¶ 16. On September 29, 2023, plaintiff twice "forwarded" Ms. Crenny "a welcome letter" plaintiff "needed Ms. Crenny's approval on[.]" *Id.* ¶ 17. Plaintiff "forgot that she" had emailed the welcome letter to Ms. Crenny and, on October 2, 2023, she "sent Ms. Crenny a message via Teams to make sure that she let plaintiff know when she had the letter approved." *Id.* Ms. Crenny responded by email, stating: "'Sabrina you have sent me two emails about this welcome letter, print it out, put on my desk, told me you would put it on my desk, and now sending me a message. I got it! When did I NOT tell you when I approve your files??? Ofc I will. For Christ's sake, she is moving in on November 29. I have a lot of work with higher priorities.'" *Id.*

On October 4, 2023, plaintiff filed her first complaint with defendant's HR office. *Id.* ¶ 18. On October 9, 2023,[7] Plaintiff "requested that Ms. Hamilton provide her commission sheet to confirm that all leases necessary for her commission payout had been accounted for." *Id.* ¶ 19.

---

[6] Plaintiff refers to this employee as "Mr. Crenny" but throughout the rest of the Complaint, she refers to an employee as "Ms. Crenny[.]" *See* ECF 2, ¶ 15. It is not clear to the Court whether this difference is a typographical error or whether there were two employees with the same last name.

[7] In the Complaint, plaintiff claims that this interaction occurred on October 9, 2024. ECF 2, ¶ 19. But, in her Opposition, plaintiff clarified that this date was "a scrivener's error", and that "the date is plainly intended to be October 9, 2023." ECF 14 at 14 n.1.

Hamilton "initially responded that it was unnecessary" to provide plaintiff with a commission sheet. *Id.* However, "after repeated exchanges," Hamilton "eventually agreed to provide the information, stating that she would do so just this time." *Id.*

On the same day, "plaintiff asked Ms. Hamilton for a ride to the company's event and Ms. Hamilton told her that she would pick her up." *Id.* ¶ 21. However, Ms. Hamilton subsequently "sent Plaintiff an email telling her that she [was] riding with a co-worker, so Plaintiff was forced to travel via metro to attend the event." *Id.*

Plaintiff claims that in mid October 2023, she "was subjected to sexist remarks and was told by Ms. Hamilton that certain tasks should be done by a man." *Id.* ¶ 22. Then, in December 2023, approximately three months after plaintiff filed a complaint with HR, Cato "was assigned to work alone on a Saturday, December 2, 2023, from 9:00 a.m. to 5:00 p.m." *Id.* ¶ 23. Because of a "heavy workload, Plaintiff did not take a lunch break during her work shift" on that date. *Id.* ¶ 24. At about 4:00 p.m., plaintiff "used the restroom and did not return to her desk, effectively using that time as her lunch hour." *Id.* Ms. Hamilton was "monitoring the office through surveillance cameras from home[.]" *Id.* ¶ 25. Hamilton "reported Plaintiff to HR," claiming that plaintiff had "abandoned her shift." *Id.*

Three days later, on December 5, 2023, Plaintiff was terminated, "allegedly for leaving work early[.]" *Id.* ¶ 26. Plaintiff claims that this reason was a "pretext for discrimination and retaliation." *Id.* After her termination, "Plaintiff was evicted from her apartment by Defendant prior to the expiration of her lease that was supposed to be August 2024." *Id.* ¶ 27. Defendant also "attempted to block" Cato "from receiving unemployment benefits by telling the HR team that Plaintiff resigned." *Id.* ¶ 28.

On April 16, 2024, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Civil Rights, alleging discrimination and retaliation.  *Id.* ¶ 29; *see* ECF 9-2 (the "Charge").[8]  The Charge required plaintiff to write "The particulars."  *Id.* at 2.  She stated, *id.*:

> I began my employment with the above-named Respondent on 4/22/22 as a Leasing Consultant.  I was employed under the supervision of Jodian Hamilton.  My regional manager Jane Flynn (White Female) asked me if I was 'ghetto'.  I sent an email to the owner Andy (White Male) and to HR manager Carolyn Reynolds about the way my manager talked to me in email and in person, she has used vulgar language towards me.  Nothing was done.  The Respondent has warned me not to post photos on Instagram while on the company property.  Numerous other employees have posted pictures on IG and have not been disciplined or discharged.
>
> Respondent claims I was discharged for posting pictures on Instagram on the company property.
>
> I believe I have been discriminated against because of my sexual identity-Transgender, Gender Identity, in violation of Title VII of the Civil Rights Act of 1964, as amended with respect to being discharged and retaliated against.

The Charge form (ECF 9-2) does not contain simple boxes to check, identifying statutory claims, which would undoubtedly prove helpful to a self-represented individual.  But, it contains a box to specify the "Date(s) Discrimination Took Place."  *Id.*  In particular, it asks for the "Earliest" and "Latest" dates.  Plaintiff stated that the "earliest" date and the "latest" date were both December 5, 2023.  *Id.*  Notably, Cato left blank the boxes on the form titled "Discrimination Based On" and "Retaliation."  *Id.*

Additional facts are included, *infra*.

---

[8] On April 24, 2024, "the EEOC notified Plaintiff that her charge was selected for early mediation."  ECF 2, ¶ 30.  Then, on February 27, 2025, "the EEOC transferred the charge to the Maryland Commission on Civil Rights (MCCR) for further processing."  *Id.* ¶ 31.  Plaintiff received her "Notice of Right to Sue", dated August 6, 2025.  ECF 14 at 2.  Suit followed on September 10, 2025.  ECF 2.

## II.    Legal Standards

### A.  Fed. R. Civ. P. 12(b)(6)

Defendant has moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  *See* ECF 9; ECF 9-1.  A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *cert. denied*, 583 U.S. 1008 (2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).    Thus, "a ruling under Rule 12(b)(6) presents a pure question of law[.]"  *Guzman v. Acuarius Night Club LLC*, 167 F.4th 217, 221 (4th Cir. 2026).

The "court's role under Rule 12(b)(6) is to evaluate the sufficiency of a complaint . . . ." *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024).  Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds"

- 7 -

for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *see Brown-Hyatt v. Brenner*, SAG-25-1737, 2025 WL 2855769, at *2 (D. Md. Oct. 8, 2025) (same).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'"); *see also Rice v. Adams,* 172 F.4th 428, 432 (4th Cir. 2026); *United States ex rel. Sheldon v. Allergan Sales, LLC*, 170 F.4th 227, 242 (4th Cir. 2026); *L.M. by Roe #1 v. Graham*, 168 F.4th 196, 200 (4th Cir. 2026); *Johnson v. Baltimore City, Maryland*, 163 F.4th 808, 814 (4th Cir. 2026); *Harmon v. Coleman Worldwide Moving, LLC*, 2025 WL 3764220, at *1 (4th Cir. Dec. 30, 2025) (per curiam); *Seabrook v. Driscoll*, 148 F.4th 264, 269 (4th Cir. 2025); *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025); *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021); *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).

A plausible claim is one that is more than merely conceivable or speculative.  *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678; *see Sheldon*, 170 F.4th at 242.  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

As the Fourth Circuit has recognized, plaintiffs are not required "to prove [their] case in the complaint."  *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012)

(recognizing that "[t]he requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at [her] disposal at the outset"); *see Lowy v. Daniel Defense, LLC,* 167 F.4th 175, 193 (4th Cir. 2026).  Furthermore, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."  *See Neitzke v. Williams*, 490 U.S. 319, 327 (1989).  Indeed, it is "error" for a district judge to give "a serious claim the back of its hand" because it does not believe the plaintiff's allegations.  *See Colon Health Ctrs. of Am., LLC v. Hazel,* 733 F.3d 535, 545 (4th Cir. 2013).

Rather, in considering a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Nichols v. Bumgarner*, 173 F.4th 511, 520 (4th Cir. 2026); *Env't Hydrogeological Consultants, Inc. v. N. Am. Risk Servs., Inc.,* 2026 WL 674349, at *2 (4th Cir. Mar. 10, 2026) (unpublished); *Cooper v. City of Wheeling*, 169 F.4th 220, 223 (4th Cir. 2026); *Walls v. Prince George's Cnty.*, 2026 WL 497988, at *1 (4th Cir. Feb. 23, 2026) (per curiam); *Johnson*, 163 F.4th at 814; *Bermeo v. Andis*, 163 F.4th 87, 93 (4th Cir. 2025)*; Hebb v. City of Asheville, N. Carolina,* 145 F.4th 421, 432 (4th Cir. 2025); *Barbour v. Garland,* 105 F.4th 579, 589 (4th Cir. 2024); *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts."  *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010). Nor does the court accept "'legal

conclusions couched as facts . . . .'"  *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th

Cir. 2022) (citation omitted).

"A court decides whether [the pleading] standard is met by separating the legal conclusions

from the factual allegations, assuming the truth of only the factual allegations, and then

determining whether those allegations allow the court to reasonably infer" that the plaintiff is

entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th.

Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).  Mere recitals of a cause of action, supported only

by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion.  *Morrow v. Navy*

*Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022); *see Sheppard v. Visitors*

*of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021).

That said, a plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2).

*Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a

complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v.*

*City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).  However, mere "'naked assertions' of

wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d

186, 193 (4th Cir. 2009) (citation omitted); *see Johnson v. Navy Fed. Credit Union*, 2025 WL

2437832, at *2 (4th Cir. Aug. 25, 2025) (per curiam).

In other words, the rule demands more than bald accusations or mere speculation.

*Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir.

2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation

of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n

unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of

relief.  *Iqbal*, 556 U.S. at 678; *see Katti v. Arden*, 161 F.4th 217, 224 (4th Cir. 2025).  Instead, to

satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

A plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g.*, *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). But, in civil rights cases, at the Rule 12(b)(6) stage, courts "must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by the facts alleged*." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (internal quotations and citations omitted) (emphasis in original).

Ordinarily, when ruling on a Rule 12(b)(6) motion, a court does not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Harrold v. Hagen*, 174 F.4th 393, 400

(4th Cir. 2026); *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023); *Bing v. Brio Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear [ ] *on the face of the complaint.*'"  *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250); *see L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Goines*, 822 F.3d at 166 (citation omitted) (a court may properly consider documents that are "explicitly incorporated into the complaint by reference . . . and those attached to the complaint as exhibits"); *see also Redding v. Noem,* 168 F.4th 203, 205 (4th Cir. 2026); *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Moreover, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Finn v. Humane Soc'y of the United States*, 160 F.4th 92, 96 n.2 (4th Cir. 2025); *Doriety,* 109 F.4th at 679; *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Carrington Sturgis v. Warden Jeff Nines*, SAG-25-841, 2025 WL 3240039, at *2 (D. Md. Nov. 20, 2025); *Moody v. The Board of Education of Wicomico* County, SAG-25-00642, 2025 WL 3119201, at *4 (D. Md. Nov. 7, 2025).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in *Chesapeake Bay Found., Inc.*) (citation omitted); *see Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam).

In the usual course, the "exhibit-prevails rule" applies.  It "provides that 'in the event of [a] conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails.'" *Goines*, 822 F.3d at 166 (citing *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).  However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the [party] attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).  Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting

allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

In the context of a Rule 12(b)(6) motion, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011); *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may only take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) [ ] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

In addition, a court "may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x 200 (4th Cir. 2016). A district court may also take "judicial notice of its own records." *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990); *see also Thurman v. Robinson*, 51 F.3d 268, 1995 WL 133350, at *2 (4th Cir. Mar. 28, 1995) (per curiam); *United States Fidelity & Guar. Co. v. Lawrenson,* 334 F.2d 464, 467 (4th Cir. 1964). Courts may also take judicial notice of matters of public record, including EEOC charges and decisions in employment discrimination cases. *Wooten v. Univ. of Maryland, Baltimore*, 733 F. Supp. 3d 402, 418 (D. Md. 2024).

Fed. R. Civ. P. 12(d) is also pertinent.  It provides: "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."   *Wilson-Cook Medical, Inc. v. Wilson*, 942 F.2d 247, 252 (4th Cir. 1991); *see also Fonte v. Board of Mgers. of Continental Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("If the district court *considered* the affidavit in disposing of the Rule 12(b)(6) motion, it erred in failing to convert the motion to one for summary judgment as the rule requires." (citations omitted; emphasis added)); *Goldman v. Belden*, 754 F.2d 1059, 1066 (2nd Cir. 1985) ("Rule 12(b) provides that to the extent that the court decides to consider matters outside of the complaint in ruling on a motion pursuant to Rule 12(b)(6), 'the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . .'").

Under Rule 12(d), a court has "'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" *Sager v. Hous. Comm'n,* 855 F. Supp. 2d 524, 542 (D. Md. 2012) (quoting 5C Charles Alan Wright et al., *Federal Practice & Procedure* § 1366 (3d ed. 2004, 2011 Supp.)).  However, it would be improper for the Court to convert the Motion to one for summary judgment before discovery has begun, and because plaintiff has not received notice.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5 (1986) ("[S]ummary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."); *E.I. du Pont de Nemours & Co.,* 637 F.3d at 448–49 (finding summary judgment inappropriate "where the parties have not had an opportunity for reasonable discovery"); *Laughlin v. Metro Washington Airports Auth.*, 149 F. 3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court—instituted changes" in the posture of a motion,

including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Hous., LLC v. City of Salisbury, Md.*, 672 F. App'x 220, 220 (4th Cir. 2016) (per curiam) ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'").

As indicated, defendant has submitted the EEOC Charge (ECF 9-2). I may consider this exhibit without converting the Motion to one for summary judgment. "In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Campbell v. Mayorkas*, MOC-20-697, 2021 WL 2210895, at *1 n.3 (W.D.N.C. June 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)); *see Jacques v. Balt. City Police Dep't*, SAG-21-02682, 2022 WL 1061980, at *3 (D. Md. Apr. 8, 2022); *Stennis v. Bowie State Univ.*, 236 F. Supp. 3d 903, 907 n.1 (D. Md. 2017), *aff'd in part, vacated in part on other grounds*, 716 F. App'x 164 (4th Cir. 2017). Moreover, the EEOC Charge that plaintiff filed on April 16, 2024 (ECF 9-2) is integral to the suit. *See, e.g., Parker v. Whole Food Mkt. Grp., Inc.*, JRR-23-03321, 2025 WL 403734, at *2 n.4 (D. Md. Feb. 4, 2025) ("In the employment discrimination context, courts regularly conclude that EEOC charges are integral to a plaintiff's complaint."); *Webb v. Potomac Elec. Power Co.*, TDC-18-3303, 2020 WL 1083402, at *2 (D. Md. Mar. 6, 2020) ("[T]he Court will consider Webb's EEOC Charge, submitted with the Motion, as a document integral to the Amended Complaint because Webb referenced the EEOC Charge in the Amended Complaint and he has not objected to its authenticity."); *Evans v.*

*Md. State Hwy. Admin.*, JKB-18-935, 2018 WL 4733159, at \*1 n.1 (D. Md. Oct. 2, 2018) (same); *White v. Mortg. Dynamics, Inc.*, 528 F. Supp. 2d 576, 579 (D. Md. 2007) (same).

### B.  Title VII

As stated, plaintiff has lodged claims for discrimination (Count I) and retaliation (Count II) under Title VII.

### 1.  Discrimination

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," and from "limit[ing], segregat[ing], or classify[ing] . . . employees or applicants from employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a); *see, e.g.*, *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276–77 (4th Cir. 2015) (en banc). "These two proscriptions, often referred to as the 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate impact' provision, are the only causes of action under Title VII." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015); *see Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021); *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015).

The Supreme Court has referred to discrimination based on one of the five characteristics specified above—race, color, religion, sex, or national origin—as "status-based discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013). Moreover, the phrase "terms, conditions or privileges of employment" is regarded as "an expansive concept." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).

- 17 -

At trial, a plaintiff may establish a discrimination claim "through two avenues of proof." *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284 (4th Cir. 2004); *see Bomar v. Board of Education of Harford County et al.*, 2026 WL 1031816, at \*4 (4th Cir. Apr. 16, 2026) (per curiam). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997); *see Thomas v. Delmarva Power & Light Company*, 715 F. App'x 301, 302 (4th Cir. 2018).  The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 213 (2015) (construing the Pregnancy Discrimination Act); *Massaro v. Fairfax Co.*, 95 F.4th 895, 902 (4th Cir. 2024); *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021).

If the plaintiff chooses to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intel. Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  To establish a prima facie case of disparate treatment under Title VII, the plaintiff must demonstrate "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (quoting *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012)); *see Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018); *Goode v. Cent. Va. Legal Aid Soc., Inc.*, 807 F.3d 619, 626 (4th Cir. 2015).

With regard to adverse action, it must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Sempowich*, 19 F.4th at 650 (citing *Bing, 959* F.3d at 616 n.8); *see Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)). However, the employee suffering the adverse action "does not have to show . . . that the harm incurred was 'significant' . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024) (citation omitted).

The Supreme Court has said that "[t]he prima facie case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic.'" *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)). "'Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Id.* (quoting *Furnco Construction Corp.*, 438 U.S. at 577). To clear this hurdle, a plaintiff must allege "sufficient facts to make it plausible that (1) she suffered an adverse employment action, and (2) the action was because of" a protected status under Title VII. *Franovich v. Hanson*, 687 F. Supp. 3d 670, 683 (D. Md. 2023).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, nondiscriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (S. Ct. 2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S.

248, 255 (1981).   In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993).

In assessing a defendant's proffered reasons for its actions, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'"  *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (alterations and citation omitted).  If the defendant establishes a nondiscriminatory reason for an adverse action, the burden shifts to the plaintiff to prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination."  *Burdine*, 450 U.S. at 256; *see Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *see also Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in *Adams* and *Jiminez*).  In other words, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves*, 530 U.S. at 142 (quoting *Burdine*, 450 U.S. at 253); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle*, 650 F.3d at 336.

Of course, this case is at the motion to dismiss stage, not trial or even summary judgment. At this juncture, plaintiff is not required to set forth facts that establish a prima facie case under Title VII.  *Bing*, 959 F.3d at 616; *see Credle v. Virginia Cmty. Coll. Sys.*, 2026 WL 509313, at *2

(4th Cir. Feb. 24, 2026) (unpublished).  This is because the "prima facie case . . . is an evidentiary standard, not a pleading requirement."  *Swierkiewicz*, 534 U.S. at 510.  Moreover, "the Federal Rules do not contain a heightened pleading standard for employment discrimination suits[.]"  *Id.* at 515.  Instead, a plaintiff need only "offer facts that plausibly support inferences that" the elements of her claim are satisfied.  *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022); *see Johnson*, 163 F.4th at 8219; *Barbour*, 105 F.4th at 590.[9]

Although this case is at the Rule 12(b)(6) stage, reference to the proof methodologies outlined above serves to inform a court's evaluation of the sufficiency of the allegations, and whether they state a plausible claim for relief.  *Coleman*, 626 F.3d at 190; *see also Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 314 (2015); *Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1300–01 (2020).  The Fourth Circuit has made clear that "while a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Coleman*, 626 F.3d at 190 (internal citation omitted) (citing *Twombly*, 550 U.S. at 555); *see also Francis*, 588 F.3d at 193.

### 2.  Retaliation

Title VII's retaliation provision is found at 42 U.S.C. § 2000e-3(a).  It states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful

---

[9] In *Holloway v. Maryland*, RDB-20-0377, 2020 WL 4582705 (D. Md. Aug. 10, 2020), the district court applied the prima facie standard to plaintiff's discrimination claims at the motion to dismiss stage.  The Fourth Circuit stated that the district court "erred in requiring [plaintiff] to plead facts establishing a prima facie case of discrimination."  *Holloway*, 32 F.4th at 298.  Nevertheless, the Court noted that it "may affirm the dismissal despite the district court's erroneous analysis if the complaint fails under the ordinary rules for assessing sufficiency."  *Id.* at 298–99.

employment practice by this title [*i.e.*, Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." *See Cosby*, 93 F.4th at 718 (quoting 42 U.S.C. § 2000e-3(a)); *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019) (Title VII prohibits an employer from retaliating against an employee for "participating in a Title VII proceeding or opposing an employer's discriminatory practices"); *see* 42 U.S.C. § 2000e-3; *see also McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 410–11 (4th Cir. 2022). The provision's "'purpose is to protect employees who complain about real or perceived discrimination in the workplace from retaliation, which threatens to chill the willingness of employees to speak up.'" *Laurent-Workman*, 54 F.4th at 212 (citation omitted).

To state a claim for retaliation, a plaintiff must allege "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'" *Okoli v. City Of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted); *see Bomar*, 2026 WL 1031816, at *6; *Piscitelli v. Gitlab, Inc.*, 2026 WL 936898, at *2 (4th Cir. Apr. 7, 2026); *Andrews v. Dejoy*, 2026 WL 74575, at *3 (4th Cir. Jan. 9, 2026) (per curiam); *Johnson*, 163 F.4th at 819; *Anthony v. United Airlines, Inc.*, 2026 WL 35963, at *3 (4th Cir. Jan. 6, 2026) (per curiam); *Imungi v. Virginia Commonwealth Univ.,* 2025 WL 2612761, at *4 (4th Cir. Sept. 10, 2025); *Seabrook*, 148 F.4th at 272; *Jones v. Eli Lilly & Co.,* 2025 WL 1823950, at *2 (4th Cir. July 2, 2025) (per curiam); *Curry v. S.C. State Election Comm'n*, 2025 WL 1806876, at *1 (4th Cir. July 1, 2025) (per curiam); *Parker v. Children's Nat'l Med. Ctr., Inc.*, 2025 WL 1540954, at *3 (4th Cir. May 30, 2025); *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025); *Decoster v. Becerra*, 119 F.4th 332, 342 (4th Cir. 2024); *Tutt v. Wormuth*, 2024 WL 4144397, at *1 (4th Cir. Sept. 11, 2024) (per curiam); *Cosby*, 93 F.4th at 718; *Sempowich*, 19 F.4th at 653;

*Roberts*, 998 F.3d at 122; *Kitlinski v. United States Department of Justice*, 994 F.3d 224, 232 (4th Cir. 2021); *Strothers*, 895 F.3d at 327; *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016).

"At bottom, in order to adequately plead a Title VII retaliation claim, the complaint must allege facts supporting a plausible inference that the employer took an adverse employment action against the plaintiff because of the plaintiff's protected activity." *Barbour*, 105 F.4th at 590 (cleaned up) (citation and quotation marks omitted). As indicated, "at the motion to dismiss stage, a plaintiff need not establish a prima facie case. Rather, a plaintiff must merely produce sufficient allegations, accepted as true, to state 'a claim to relief that is plausible on its face.'" *Johnson*, 163 F.4th at 819 (quoting *Iqbal*, 556 U.S. at 678). Moreover, there is "no requirement that the complaint contain facts rebutting any legitimate, nondiscriminatory reason articulated by the employer for its allegedly retaliatory action." *Barbour,* 105 F.4th at 590.[10]

With respect to the first element, the Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see Netter*, 908 F.3d at 937. "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998); *see* 42 U.S.C. § 2000e-3(a).

---

[10] At trial, the plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249.

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (per curiam) (citation omitted). And, "[c]omplaints raised through internal company procedures are recognized as protected activity." *Roberts*, 998 F.3d at 122. As the Fourth Circuit has said, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citation omitted); *see Laughlin*, 149 F.3d at 259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.") However, "for an employee's activity to constitute protected 'opposition,' she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, and (2) that her conduct in opposition was reasonable." *Netter*, 908 F.3d at 937–38 (citation omitted); *see also Cosby*, 93 F.4th at 718–19.

The second element is that of an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added). In other words, the adverse action "need not be employment- or workplace-related in order to sustain a retaliation claim." *Id.*; *see also Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision." *Strothers*, 895 F.3d at 327; *see Herkert v. Bisignano*, 151 F.4th 157, 165 (4th Cir. 2025) ("The anti-retaliation provision, by contrast, is not tied to the terms and

- 24 -

conditions of employment, and so may 'include a wider variety of conduct within its scope.'")
(quoting *Laurent-Workman*, 54 F.4th at 213).

"Although Title VII's anti-retaliation provision is not tied to the terms and conditions of
employment, only materially adverse actions serious enough to dissuade a reasonable worker from
making or supporting a charge of discrimination will satisfy this element of a Title VII retaliation
claim." *McGuire v. Harford County*, 2026 WL 874154, at *10 (D. Md. Mar. 31, 2026) (cleaned
up) (quotation marks and citation omitted); *see Herkert*, 151 F.4th at 165–66; *Ray*, 909 F.3d at
667; *Weide v. City of Cumberland*, SAG-25-03566, 2026 WL 1084921, at *5 (D. Md. Apr. 22,
2026). In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty
slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, CCB-
08-183, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).
Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d
199, 208 (4th Cir. 2019). Rather, actions such as "discharge, demotion, decrease in pay or benefits,
loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute
adverse actions. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). "This standard is sometimes
referred to as a "'significant harm' requirement[.]" *Herkert,* 151 F.4th at 166.[11]

To show causation under Title VII, the plaintiff bears the burden of establishing that the
alleged retaliation "would not have occurred in the absence of the alleged wrongful action or
actions of the employer." *Nassar*, 570 U.S. at 360; *see Crouch v. SunCakes NC, LLC*, 2026 WL

---

[11] The Fourth Circuit clarified that although the Title VII retaliation "'significant harm' requirement" has "some linguistic overlap with the heightened threshold of harm rejected by *Muldrow* . . . because the 'materially adverse' standard was 'adopted . . . for reasons peculiar to the retaliation context,' *Muldrow*'s analysis of discrimination claims leaves it unchanged." *Herkert,* 151 F.4th at 166 (quoting *Muldrow*, 601 U.S. at 357).

497985, at *3 (4th Cir. Feb. 23, 2026); *Haggins,* 163 F.4th at 881; *Irani v. Palmetto Health,* 767 F. App'x 399, 421 (4th Cir. 2019) (per curiam). This requirement of but-for causation imposes a higher burden on a plaintiff than the mixed-motive standard in Title VII's antidiscrimination provision. *See Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 249–50 (4th Cir. 2015). In other words, the plaintiff must allege that she suffered an adverse action because she engaged in protected activity. *Massaro*, 2024 WL 1162061, at *5.

But, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335. Indeed, "very little evidence of a causal connection is required to establish a prima facie case of retaliation." *Roberts*, 998 F.3d at 127 (citing *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012)); *see Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021). However, "[i]n order to demonstrate the requisite causal relationship," the Fourth Circuit has "'consistently required proof of a decisionmaker's knowledge of protected activity to support a Title VII retaliation claim.'" *Anthony*, 2026 WL 35963, at *3 (quoting *McIver*, 42 F.4th at 412). "Knowledge of a protected activity means not only knowledge that the activity occurred, but also knowledge that the employee engaged in the protected activity *because* the employee had a reasonable belief that a Title VII violation occurred." *McIver*, 42 F.4th at 412 (emphasis in original) (citation omitted).

A plaintiff may attempt to establish that a protected activity caused an adverse action "'through two routes.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783–84 (4th Cir. 2021)); *see Johnson*, 163 F.4th at 819; *CSRA*, 12 F.4th at 417. The two avenues are: "(1) by establishing a temporal proximity between the protected activity and adverse action, or (2) by establishing that other relevant evidence indicates continuing retaliatory

conduct and animus' toward the plaintiff." *Johnson*, 163 F.4th at 819 (internal quotation marks and citation omitted).

In general, "temporal proximity suffices to show a causal relationship." *Sempowich*, 19 F.4th at 654; *see Seabrook*, 148 F.4th at 273; *Haggins,* 163 F.4th at 881.  In *Strothers*, 895 F.3d at 335–36, the Court said: "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity."  *See also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.") (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653 (4th Cir. 1998)).  But, "just because one thing happened after another does not prove the earlier event caused the later one."  *Reeves v. Hegseth*, 2026 WL 687193, at *2 (4th Cir. Mar. 11, 2026).

The Fourth Circuit has "held that causation can be inferred when 'the employer takes adverse employment action against an employee shortly after learning of the protected activity.'" *Massaro*, 2024 WL 1162061, at *5 (quoting *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017)).  But, the Fourth Circuit has cautioned that "'the temporal proximity must be very close.'" *Massaro*, 2024 WL 1162061, at *5 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (cleaned up).  Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'"  *Massaro*, 2024 WL 1162061, at *5 (citation omitted).

Of relevance, the Fourth Circuit recently held that the "one-month interim between [plaintiff's] protected activity and discharge, standing alone, does not suffice to show the causal link needed for her prima facie case of retaliation." *Haggins,* 163 F.4th at 881; *see Barnhill,* 138 F.4th at 132 ("While there is not a bright-line rule instructing when temporal proximity is sufficient to establish causation, without other evidence of causation, the gap between the protected activity and the adverse employment action can generally be no longer than two months."); *Roberts*, 998 F.3d at 126 (three months); *see also Clarke v. DynCorp Int'l LLC*, JFM-12-3267, 962 F. Supp. 2d 781, 790 (D. Md. 2013) ("[A] lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'") (quoting *King*, 328 F.3d at 151 n.5); *but see Hollis v. Morgan State Univ.*, 153 F.4th 369, 384 (4th Cir. 2025) (finding "a degree of temporal proximity that our precedent suggests may allow a jury to infer a causal connection" when the ""protected activity and adverse action were separated by less than three months"). Moreover, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment for employer where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"); *see Jones*, 2025 WL 1823950, at *2.

Temporal proximity is not the sole avenue to establish causation, however. *CSRA*, 12 F.4th at 417. Indeed, "the absence of temporal proximity alone is not fatal" to a plaintiff's retaliation claim. *Johnson*, 163 F.4th at 819. A plaintiff can "overcome an absence of temporal proximity" through "'evidence of recurring retaliatory animus during the intervening period' . . . ." *Massaro*,

2024 WL 1162061, at *6 (quoting *Lettieri*, 478 F.3d at 650) (cleaned up); *see Barbour,* 105 F.4th at 593.  The alternative path contemplates the existence of "a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity."  *Barnhill,* 138 F.4th at 132.

### 3.   Hostile Work Environment

The Complaint does not include a separate claim for hostile work environment.  But, plaintiff alleges in her Title VII discrimination claim that "Defendant's conduct created a hostile work environment[.]"   ECF 2, ¶ 41.  And, both sides discuss whether plaintiff has exhausted and plausibly alleged a hostile work environment claim.  *See* ECF 9-1 at 14–15, 22–27; ECF 14 at 9–10, 12–13.[12]

"An employer violates the substantive discrimination provision [of Title VII] when it subjects an employee to a hostile work environment."  *Laurent*, 54 F.4th at 210.  To state a claim for hostile work environment under Title VII, a "'plaintiff must [allege] that the offending conduct

---

[12] "In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020); *see Margolin v. Nat'l Ass'n of Immigr. Judges*, __ U.S. __, 2026 WL 1463466, at *2 (U.S. May 26, 2026) (per curiam).  This means that "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."  *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Indeed, "Federal courts are not roving commissions licensed to sally forth each day looking for wrongs to right[.]" *Margolin,* 2026 WL 1463466, at *2 (cleaned up) (quotation marks and citations omitted).

"That principle—the 'rule that points not argued will not be considered'—distinguishes our adversarial system of justice from an inquisitorial one."  *Id.* (citation omitted).  The "courts 'call balls and strikes'; they don't get a turn at bat."  *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam); *see also Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985) (stating that, in the context of pro se plaintiffs, the Court "will not . . . require the district courts to anticipate all arguments that clever counsel may present in some appellate future. To do so . . . would . . . transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.").

(1) was unwelcome, (2) was because of her sex [race, color, religion, or protected activity], (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and (4) was imputable to her employer.'" *Cosby*, 93 F.4th at 716 (quoting *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011)); *see also Seabrook*, 148 F.4th at 271; *Barnhill*, 138 F.4th at 140; *Decoster v. Becerra*, 119 F.4th 332, 337 (4th Cir. 2024); *Nixon v. Kysela Pere et Fils, Ltd.*, 2024 WL 3666166, at *4 (4th Cir. Aug. 6, 2024); *McIver*, 42 F.4th at 407; *Boyer-Liberto*, 786 F.3d at 277; *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011).[13]

"A hostile work environment exists only when the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that it would reasonably be perceived, and is perceived, as hostile or abusive." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023). Although "the first element is subjective, 'the rest of the test is made up of objective components based on a reasonable person standard.'" *Id.* at 781-82 (quoting *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009) (quotation marks omitted)). In determining whether an objectively hostile environment exists, a court should consider "'all the circumstances,'" which "'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *see Seabrook*, 148 F.4th at 272.

To satisfy the severe or pervasive standard, a plaintiff "'must clear a high bar . . . .'" *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*,

---

[13] The Fourth Circuit has also described a hostile work environment claim as being comprised of three elements: "(1) he 'experience[d] unwelcome harassment' that was (2) 'because of . . . [his] race' and (3) 'so severe or pervasive that it alter[ed] the conditions of [his] employment and create[d] an abusive atmosphere.'" *Reeves*, 2026 WL 687193, at *1 (quoting *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023)) (alterations in *Reeves*).

521 F.3d 306, 315 (4th Cir. 2008)).  Notably, "'incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.'" *Perkins*, 936 F.3d at 208 (quoting *Sunbelt*, 521 F.3d at 315) (alteration in *Perkins* omitted).  In particular, "'rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII.'" *Perkins*, 936 F.3d at 208 (quoting *Sunbelt*, 521 F.3d at 315–16) (alterations in *Sunbelt*); *see Credle*, 2026 WL 509313, at *3.  Rather, "[h]arassment is 'based on' race, color, or sex when an employee would not have experienced the harassment 'but for' her protected characteristic."  *Seabrook*, 148 F.4th at 271 (quoting *Gilliam v. S.C. Dep't of Juv. Just.*, 474 F.3d 134, 142 (4th Cir. 2007)).

### 4.  Exhaustion

Before a plaintiff files suit under Title VII, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union,* 491 U.S. 164 (1989), *superseded on other grounds by* 42 U.S.C. § 1981(b); *see also Cowgill*, 41 F.4th at 384; *McCray v. Md. Dep't of Trans.*, 662 F. App'x 221, 224 (4th Cir. 2016); *Bryant v. Bell Atlantic, Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).  To do so, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of when "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); s*ee Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009); *Bush v. Frederick Cnty. Pub. Schs.*, No. 23-1127, 2024 WL 639255, at *3 (4th Cir. Feb. 15, 2024) *Williams*, 370 F.3d at 428. This period is extended to 300 days in a deferral state, such as Maryland. *See Jones*, 551 F.3d at 300; *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 439 (4th Cir. 1998), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Bush*, 2024 WL 639225, at *3; *Garnes v. Maryland*, RDB-17-1430, 2018

WL 276425, at *4 n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F App'x 256 (4th Cir. 2008).

Moreover, "a complainant is entitled to a 'right-to-sue' notice 180 days after the charge is filed." *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 545 (2019) (citing § 2000e-5(f)(1); 29 CFR § 1601.28). "And within 90 days following such notice, the complainant may commence a civil action against the allegedly offending employer." *Fort Bend Cnty.*, 587 U.S. at 545 (citing § 2000e-5(f)(1)).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, it advances the "twin objectives" of "protecting agency authority in the administrative process and promoting efficiency in the resolution of claims." *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks, alterations, and citation omitted). It "'ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible.'" *Cowgill*, 41 F.4th at 384 (citation omitted). If an employee fails to exhaust her administrative remedies, she is generally barred from filing suit. *See, e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Bryant*, 288 F.3d at 132.

However, exhaustion is not jurisdictional. Rather, it is a "claim-processing rule[ ] that must be timely raised to come into play." *Fort Bend Cnty.*, 587 U.S. at 544. A defendant may waive arguments related to exhaustion. But, if a defendant timely asserts failure to exhaust, such a claim may warrant dismissal of the suit under Rule 12(b)(6). *See Kenion v. Skanska USA Bldg., Inc.*, RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Fort Bend Cnty.*). Notably, "[a]lthough administrative exhaustion is an affirmative defense, courts routinely grant motions to dismiss Title VII and other claims with similar administrative

exhaustion requirements for failure to exhaust." *Bailey v. Islands Mech. Contractor, Inc.*, __ F. Supp. 3d __, JCD-25-275, 2026 WL 867008, at *13 (E.D.N.C. Mar. 23, 2026).

Moreover, the exhaustion process has substantive effect. Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims specified in the administrative charge. *See* 42 U.S.C. § 2000e–5(f)(1); *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012); *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998); *Evans*, 80 F.3d at 963. Thus, "when the claims in [the] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred." *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508).

In other words, "an EEOC charge must be 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" *Keith v. Volvo Grp. N. Am., LLC*, 2024 WL 1193096, at *3 (4th Cir. Mar. 20, 2024) (per curiam) (quoting *Chacko*, 429 F.3d at 508). To illustrate, the Fourth Circuit has stated that a "'claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.'" *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 161 (4th Cir. 2018) (quoting *Chacko*, 429 F.3d at 509) (ellipsis in *Nnadozie*).

Because "EEOC charges often are not completed by lawyers," they are construed "with utmost liberality." *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 408 (4th Cir. 2013) (citation omitted); *see Sydnor*, 681 F.3d at 594 ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs."). As the Fourth Circuit has explained, the law does not "require untrained parties to provide a detailed essay to the EEOC in order to exhaust their administrative remedies." *Sydnor*, 681 F.3d at 594. And, "[d]ocuments filed by an employee with the EEOC

should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies." *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 406 (2008).  To interpret EEOC charge documents otherwise "would undermine the remedial scheme Congress adopted." *Id.*

Further, an EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Miles*, 429 F.3d at 491 (citation omitted); *see Chacko*, 429 F.3d at 512.  A federal court may hear a claim that was not presented to the EEOC so long as it is "'reasonably related'" to the plaintiff's EEOC charge "'and can be expected to follow from a reasonable administrative investigation . . . .'" *Sydnor*, 681 F.3d at 594 (quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000)); *see Sharifi v. Univ. of Maryland at Baltimore*, 2025 WL 3459771, at *1 (4th Cir. Dec. 2, 2025) (per curiam); *Cowgill*, 41 F.4th at 384; *Stewart*, 912 F.3d at 705.

The Fourth Circuit's opinion in *Jones*, 551 F.3d 297, provides guidance. In that case, the plaintiff filed a charge with the Maryland Commission on Human Relations, checking only the box for "retaliation." *Id.* She stated: "'I believe I am being forced to work in a hostile environment and subjected to differential treatment in retaliation for filing' [a prior] charge." *Id.*; *see id.* at 301. Plaintiff subsequently brought suit, alleging retaliation as well as race and sex discrimination, in violation of Title VII. *Id.* at 299. She also alleged age discrimination, in violation of the ADEA. *Id.* The district court granted summary judgment to the defendant. *Id.* at 299-301.  But, the Fourth Circuit concluded that the plaintiff had failed to exhaust administrative remedies. *Id.* at 299. It reasoned, *id.* at 301: "The . . . charge alleged that [plaintiff] was being retaliated against because she had filed [a previous] charge; it did not allege that she was discriminated against based on her

age, sex, or race. Indeed, she checked only the 'retaliation' box on her EEOC charge and left unchecked the boxes for 'age,' 'sex,' or 'race.'"

*Belyakov v. Medical Science & Computing*, 86 F.Supp.3d 430, 440 (D. Md. 2015), is also instructive. In *Belyakov*, the plaintiff applied for a job with the National Institutes of Health through the defendant staffing firm. *Id.* at 432. When plaintiff did not get the job, he filed suit against the defendant, alleging age discrimination under the ADEA, as well as national origin discrimination and retaliation under Title VII. In granting summary judgment in favor of the staffing agency as to the national origin claim, the district court said: "Belyakov did not check the box for national origin discrimination in his EEOC charge, nor did he claim national origin discrimination or allege any facts relating to his national origin . . . in the narrative portion of his EEOC charge." *Id.* at 440. Instead, the plaintiff "asserted only claims for, and alleged facts relating to, age discrimination in violation of the ADEA and retaliation in violation of Title VII . . . ." *Id.* Therefore, the court determined that the plaintiff failed to exhaust his national origin claim. *Id.*; *see also Byington v. NBRS Fin. Bank*, 903 F.Supp.2d 342, 350 (D. Md. 2012) (finding that the plaintiff failed to exhaust her administrative remedies as to age discrimination because she "did not check the box for discrimination based on age, and there is no reference to age discrimination in the narrative portion of the document"); *Talbot v. Foodservice, Inc.*, 191 F.Supp.2d 637, 640 (D. Md. 2002) (same, for disability discrimination).

### C. MFEPA

Plaintiff has lodged claims of discrimination (Count III) and retaliation (Count IV) under MFEPA. "MFEPA is the state law analogue to federal employment discrimination statutes." *Anoruo v. MedStar Health, Inc.*, JRR-23-01970, 2025 WL 1635052, at *10 (D. Md. June 9, 2025). It "has stood as an important statutory protection for employee civil rights in Maryland since its

enactment in 1965." *Graham v. Volvo Grp. N. Am. Moha*, BAH-24-1514, 2026 WL 788958, at *8 (D. Md. Mar. 20, 2026).

"[C]ourts judge discrimination and retaliation claims brought under MFEPA by the same standards as those same claims brought under Title VII." *Lowman v. Maryland Aviation Admin.*, JKB-18-1146, 2019 WL 133267, at *4 (D. Md. Jan. 8, 2019); *see Bomar,* 2026 WL 1031816, at *4 ("Courts apply the Title VII framework when analyzing similar claims brought under Section 1983, MFEPA, ADEA, and FMLA."); *Brewster v. Maryland Dep't of Veterans & Mil. Fams.*, JRR-26-01088, 2026 WL 982796, at *3 (D. Md. Apr. 13, 2026) ("MFEPA claims . . . generally track their federal counterparts."); *Mulamba v. Bd. of Educ. of Baltimore Cnty.*, No. 1656, Sept. Term, 2023, 2024 WL 5103270, at *4 (Md. Ct. Spec. App. Dec. 13, 2024) ("Maryland courts have thus applied federal frameworks in evaluating employment discrimination claims under both federal and state discrimination laws."), *cert. denied,* 490 Md. 288, 334 A.3d 832 (2025), and *cert. denied,* 146 S. Ct. 184 (2025); *Dobkin v. Univ. of Baltimore Sch. of L.*, 210 Md. App. 580, 591–95, 63 A.3d 692, 699–701 (2013) (applying federal framework to MFEPA claim based on age discrimination).

However, "in October 2022, the MFEPA was amended to clarify that harassment need not be severe or pervasive in all circumstances to be actionable." *Watrous v. AIRtec, Inc.*, TJS-24-2076, 2026 WL 2494324, at *10 (D. Md. Aug. 28, 2025); *see Graham*, 2026 WL 788958, at *9 (citing Act of May 29, 2022, § 2, 2022 Md. Laws, ch. 657, and stating that "MFEPA's new definition of harassment became effective on October 1, 2022"). And, "where the MFEPA materially departs from the language of Title VII, the MFEPA is not read in lockstep with the federal statute." *Watrous*, 2025 WL 2494324, at *10 .

Before MFEPA was amended, it "defined 'harassment' as including 'harassment based on race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability, and retain[ing] its judicially determined meaning, except to the extent it is expressly or impliedly changed in this subtitle.'" *Graham,* 2026 WL 788958, at *8 (quoting S.G. § 20-601(h) (effective Oct. 1, 2019 through Sept. 30, 2022)).  As amended, S.G. § 20-601(h)(1)(ii) provides (emphasis added):

> (h) "Harassment" includes:
>
> (1) *unwelcome and offensive conduct, which need not be severe or pervasive*, when:
>
> > (i)    the conduct is based on race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, disability, or military status; and
> >
> > (ii)   1. submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;
> >
> > 2. submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or
> >
> > 3. based on the totality of the circumstances, *the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile*

"MFEPA's post-October 2022 definition of harassment . . . expressly departs from the 'severe or pervasive' standard." *Graham,* 2026 WL 788958, at *11 n.9.  In light of the amendment, "to bring a harassment or hostile work environment claim under the MFEPA, it is sufficient to prove that the conduct creates an objectively abusive or hostile work environment." *Watrous*, 2025 WL 2494324, at *10.  Otherwise, "[t]he elements of a harassment or hostile work environment claim under the MFEPA are . . . the same as those under Title VII." *Id.*

### III.   Discussion

### A. Exhaustion

As recounted earlier, plaintiff stated the following in the Charge, ECF 9-2 at 2:

> I began my employment with the above-named Respondent on 4/22/22 as a Leasing Consultant.  I was employed under the supervision of Jodian Hamilton.  My regional manager Jane Flynn (White Female) asked me if I was 'ghetto'.  I sent an email to the owner Andy (White Male) and to HR manager Carolyn Reynolds about the way my manager talked to me in email and in person, she has used vulgar language towards me.  Nothing was done.  The Respondent has warned me not to post photos on Instagram while on the company property.  Numerous other employees have posted pictures on IG and have not been disciplined or discharged.
>
> Respondent claims I was discharged for posting pictures on Instagram on the company property.
>
> I believe I have been discriminated against because of my sexual identity-Transgender, Gender Identity, in violation of Title VII of the Civil Rights Act of 1964, as amended with respect to being discharged and retaliated against.

Defendant asserts that Cato "did not exhaust her administrative remedies with respect to her race discrimination claims, her sexual orientation discrimination claims (as well as her sex discrimination claims, to the extent they are separate from her claims of discrimination based on her gender identity/transgender status), any hostile work environment claim that Plaintiff appears to be attempting to insert into her discrimination claims in Counts I and III, and any claims based on conduct outside the scope of the underlying Charge of Discrimination."  ECF 9-1 at 12.  I consider each argument, in turn.

### 1.   Conduct Outside the Scope of the Charge

Defendant points out that the Charge "alleges only that she was terminated on December 5, 2023, because she is transgender and in retaliation for a complaint she made."  ECF 9-1 at 16.  Therefore, defendant contends that "any discrimination or retaliation claims based on conduct other than that occurring on December 5, 2023 (the date on which the Charge alleges the

discrimination and retaliation took place), is outside the scope of the Charge and should be dismissed." *Id.*; *see also* ECF 17 at 8. And, defendant contends that the Complaint "alleges various conduct that was not included in [plaintiff's] Charge, including conduct by Ms. Hamilton and Ms. Crenny." ECF 9-1 at 16 (citing ECF 2, ¶¶ 8–9, 11, 13–17, 19–25). Defendant also complains that the suit "alleges post-termination conduct–that Mission Rock evicted her from her apartment and prevented her from obtaining unemployment benefits", yet these allegations are not contained in the Charge. ECF 9-1 at 16.

Plaintiff asserts that she "alleges post-termination retaliation: eviction from employer-provided housing and interference with unemployment benefits via a false resignation narrative." ECF 14 at 10. According to plaintiff, "[t]hose alleged acts are part of the same retaliation sequence that began after Plaintiff complained and culminated in termination[.]" *Id.* Therefore, plaintiff reasons, "[s]uch allegations are reasonably related to the charge and are actionable under Title VII and MFEPA." *Id.* She posits that "Title VII's protections extend to former employees and reach post-employment retaliation that would dissuade a reasonable worker from complaining." *Id.* (citing *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346 (1997)).

As to the "date(s) discrimination took place", Cato indicated in the Charge that December 5, 2023, was both the earliest and the latest date of discrimination. ECF 9-2 at 2. That is the date on which plaintiff was discharged from employment. When Cato filed the Charge months later, on April 16, 2024, she did not allege post-termination misconduct by defendant. As discussed, the Charge did not have boxes to check. *See id.*

"The time frame described in the charge and the complaint is . . . a relevant factor in determining whether or not a factual relationship exists." *Sickinger v. Mega Sys., Inc.*, 951 F. Supp. 153, 155 (N.D. Ind. 1996). Indeed, courts have found that when an individual has listed

only one date on a Charge, *and* "the narrative does not mention discrimination on any other date, including any continuing pattern of discrimination", then plaintiff has not exhausted her administrative remedies as to claims of "ongoing" discrimination. *See, e.g., June v. Ferry*, MGL-23-4995, 2024 WL 2853577 (D.S.C. Feb. 22, 2024) (determining that because "Plaintiff's charge identifies race as the only basis for discrimination, describes only his termination, and lists only his termination date . . . as both the earliest and latest date discrimination allegedly occurred . . . . Plaintiff has failed to exhaust his administrative remedies as to any other Title VII claims beyond wrongful termination based on race [and] any such Title VII claims are barred"), *report and recommendation adopted sub nom. June v. Dick Smith Ford of Columbia*, SVH-23-4995, 2024 WL 2956468 (D.S.C. June 11, 2024); *Webber v. Aeroflow, Inc.*, WCM-21-251, 2022 WL 3209313 (W.D.N.C. July 5, 2022) (finding that plaintiff did not exhaust her constructive discharge claim because "[t]he Charge asserted a single date on which discrimination occurred, and Plaintiff did not indicate any 'continuing action' by Defendant . . . . the EEOC did not have the opportunity to consider whether Plaintiff's demotion led to her constructive discharge."), *report and recommendation adopted,* MR-21-00251, 2022 WL 3205020 (W.D.N.C. Aug. 8, 2022); *see also McRae v. Robeson Cnty. Bd. of Elections,* JEG-08-93, 2010 WL 883014, at *5 (E.D.N.C. Jan. 27, 2010), *report and recommendation adopted as modified*, FL-08-93, 2010 WL 883013 (E.D.N.C. Mar. 8, 2010).

But, the time frame of discriminatory conduct indicated on an EEOC form is not necessarily dispositive. Rather, the task of the court is to consider the entirety of information in the charge to assess whether plaintiff's claims fall within the reasonable scope of an EEOC investigation stemming from the charge. *See Giraldo v. City of Columbia*, 47 F. Supp. 3d 430, 438 (D.S.C. 2014) (finding "Plaintiff's claim of retaliatory discharge can reasonably be expected

to flow from her charge [and was exhausted] despite the dates cited", which did not include the date of her termination, because her amended charge included "an allegation that she had been discharged.")

Here, the narrative portion of the Charge includes allegations beyond the discharge from employment. *See* ECF 9-2 at 2. For example, plaintiff describes her manager's use of racially hostile and "vulgar" language. *Id.* These allegations are related to plaintiff's allegations concerning conditions at her workplace prior to her termination. Therefore, even though plaintiff listed the date of her termination as both the earliest and the latest date of discrimination, she is not procedurally barred from bringing claims arising from conduct that occurred before she was discharged.

"When examining retaliatory acts that have occurred *after* the filing of the administrative charge . . . the Fourth Circuit has held that a plaintiff need not file an additional charge to allege that she was retaliated against for filing a charge with the EEOC." *Joachin v. AME, Inc.*, KDW-22-2767, 2023 WL 3324963, at *4 (D.S.C. Mar. 7, 2023) (emphasis in original), *report and recommendation adopted,* JFA-22-2767, 2023 WL 3071413 (D.S.C. Apr. 25, 2023). However, this exception does not apply if plaintiff "had knowledge of the factual basis for her retaliation claim before she filed her charge with the EEOC." *Tonkin v. Shadow Mgmt., Inc.*, 605 F. App'x 194, 194 (4th Cir. 2015) (per curiam).

In *Plunkett v. Potter*, 751 F. Supp. 2d 807, 809 (D. Md. 2010), a United States Postal Service ("USPS") employee filed an EEOC charge, alleging discrimination based on disability. The claimant alleged that, in response to her EEOC charge, the USPS terminated her employment. *See id.* at 810. Thereafter, the claimant filed suit alleging retaliation, without first filing a second charge with the EEOC regarding her termination. *See id.* The court rejected the defendant's

- 41 -

argument that the retaliation claim was unexhausted, concluding that the claimant was "not required to file a separate charge of discrimination with the EEOC" and could "amend her initial Complaint to include her claim of retaliation as a result of her ultimate termination by the USPS." *Id.* at 813.

In *Nealon v. Stone*, 958 F.2d 584, 586 (4th Cir. 1992), a U.S. Army employee filed an EEOC charge alleging that she was subjected to unequal pay based on gender. In her suit in federal court, she alleged that the Army retaliated against her for filing her EEOC charge. *Id.* at 590. The Court determined that "a plaintiff may raise [a] retaliation claim for the first time in federal court." *Id.* (citing *Malhotra v. Cotter & Co.*, 885 F.2d 1305 (7th Cir. 1989) (stating that "a separate administrative charge is not prerequisite to a suit complaining about retaliation for filing the first charge")).

*Rogers v. Conmed, Inc*., CCB-09-3397, 2010 WL 3056666 (D. Md. Aug. 3, 2010), is also informative. There, Judge Blake said, *id.* at *4-5 (emphasis added; internal citations omitted):

> If a plaintiff has not referenced his retaliation claim in his EEOC charge, the claim has not been properly exhausted . . . . As an exception to the rule, the Fourth Circuit has held that claims of retaliation *for actions that follow the filing of an EEOC charge* are reasonably related to the original complaint and thus may be raised for the first time in court . . . . Yet *when a plaintiff's claims of discrimination could have been raised in his EEOC charge, this exception does not apply*.

As noted, plaintiff was discharged from employment on December 5, 2023. More than four months later, on April 16, 2024, she filed the Charge. It contains no allegations of retaliatory conduct after the termination. *See* ECF 9-2 at 2. But, in the Complaint, plaintiff alleges that she "was evicted from her apartment by defendant prior to the expiration of her lease that was supposed to be August 2024" and that defendant "attempted to block Plaintiff from receiving unemployment benefits by telling the HR team that Plaintiff resigned." ECF 2, ¶¶ 27, 28. Plaintiff does not provide the dates when these actions allegedly occurred.

If Mission Rock engaged in retaliatory actions after Cato filed her EEOC Charge, then plaintiff's allegations of post-termination retaliatory conduct, *see* ECF 2, ¶¶ 27, 28, would not require exhaustion. On the other hand, if defendant engaged in these allegedly retaliatory actions before plaintiff filed her Charge with the EEOC, plaintiff's allegations in the Complaint of post-termination retaliation would be procedurally barred. And, as stated, the Complaint is silent as to when the alleged post-termination retaliation occurred. Nor does the Opposition specify when the alleged retaliatory conduct took place. *See* ECF 9-1 at 16–17; ECF 14 at 7–8. Without allegations as to when the retaliatory, post-termination conduct occurred, the Court is left to guess when these alleged actions took place and, accordingly, whether plaintiff has properly exhausted these claims.

"When considering a motion to dismiss, the court must draw all reasonable inferences and resolve all factual conflicts in the plaintiff's favor." *Harris v. Dep't. of Health & Hum. Servs.*, GJH-21-558, 2021 WL 5920645, at *2 (D. Md. Dec. 15, 2021). But, plaintiff has simply failed to plead facts that *plausibly* allege that the post-termination conduct occurred after she filed her Charge. *See Burnette v. Fahey*, 687 F.3d 171, 186 (4th Cir. 2012) (describing how plaintiff's "obligation under the *Iqbal-Twombly* pleading standard" is "to allege facts demonstrating a plausible, not merely possible, entitlement to relief"). Indeed, the "court is not permitted to step in and fill in the blanks for a partially well-pleaded cause of action." *Ford v. Wellmont Health Sys.*, PMS-09-55, 2009 WL 4544099, at *9 (W.D. Va. Nov. 30, 2009).

Because plaintiff has failed to specify when the alleged post-termination retaliatory conduct took place, the Court cannot determine whether plaintiff exhausted her administrative remedies with regard to such conduct. Therefore, any claim as to retaliation after the EEOC Charge was filed is subject to dismissal. But, I shall grant plaintiff leave to amend her Complaint to plead with the requisite specificity when the alleged post-termination conduct occurred.

Defendant also claims that the Court should not consider plaintiff's allegations involving Hamilton or Crenny because "nowhere in her Charge does plaintiff allege any conduct by Ms. Hamilton or Ms. Crenny, much less the conduct alleged in the Complaint." ECF 9-1 at 16.

The Charge does not mention Crenny. *See* ECF 9-2 at 2. As to Hamilton, the Charge states: "I was employed under the supervision of Jodian Hamilton." *Id.* However, plaintiff makes no other statements regarding Hamilton in the Charge. *See id.*

As discussed, "[t]he EEOC charge defines the scope of the plaintiff's right to institute a civil suit." *Khoury v. Meserve*, 85 F. App'x 960, 960 (4th Cir. 2004) (per curiam). Accordingly, "[s]uits must be filed only against 'the respondent named in the administrative charge,' because only named respondents received notice and the opportunity to conciliate the claims voluntarily before suit was filed." *Chambers v. Sheppard Pratt Health Sys.*, SAG-24-02316, 2025 WL 1237358, at *5 (D. Md. Apr. 29, 2025) (quoting *Membreno v. Atlanta Rest. Partners, LLC*, PX-19-00369, 2019 WL 3306020, at *5 (D. Md. July 23, 2019)).

Plaintiff has brought suit against Mission Rock. She does not lodge claims against Crenny or Hamilton, and they are not parties to this case. Accordingly, plaintiff does not need to exhaust her administrative remedies as to either Hamilton or Crenny. But, defendant maintains that the Court cannot consider plaintiff's allegations involving Hamilton or Crenny because of failure to exhaust. ECF 9-1 at 16.

To support this contention, defendant emphasizes that "a plaintiff fails to exhaust [her] administrative remedies where . . . [her] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in [her] formal suit." *Chacko*, 429 F.3d at 506; *see* ECF 9-1 at 15. Indeed, "allegations of alleged harassing conduct by additional persons, not previously identified in the EEOC charges," can be outside "the purview

of claims articulated in Plaintiff's EEOC charges." *High v. R & R Transportation, Inc.*, 242 F. Supp. 3d 433, 442 (M.D.N.C. 2017); *see Goldstein v. Univ. of Maryland*, CCB-18-2376, 2019 WL 4467035, at *8 (D. Md. Sept. 17, 2019) ("The allegations against [two colleagues, not defendants in the case] . . . are not administratively exhausted as they were not included in the EEOC charge and are not 'like or related' to the allegations in the charge.").

In evaluating exhaustion, the Court must "look at the charge as a whole." *Mercer v. PHH Corp.*, 641 F. App'x 233, 239 (4th Cir. 2016). Even if the Charge form had boxes to check, the failure of a plaintiff to check a box on a form "is only one factor in [the] analysis." *Id.*; *see Gunter v. Alutiiq Advanced Sec. Sols., LLC,* JRR-20-03410, 2026 WL 547920, at *9 (D. Md. Feb. 27, 2026) (same); *Satterfield v. City of Chesapeake, Virginia,* DEM-20-5, 2021 WL 4812452, at *5 (E.D. Va. Oct. 14, 2021) ("In evaluating the scope of the plaintiff's allegations, courts consider the entire EEOC charge form."); *Clark v. Saval*, DLB-19-3519, 2020 WL 7640819, at *6 (D. Md. Dec. 23, 2020) ("[T]he Court investigates the Charge 'as a whole[.]'") (citation omitted).

Plaintiff apparently was not represented by counsel when she filed the Charge. Indeed, "[a]dministrative charges typically aren't completed by lawyers." *Parker*, 915 F.3d at 307 (Diaz, J., concurring). And, "[d]ocuments filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies. Construing ambiguities against the drafter . . . would undermine the remedial scheme Congress adopted." *Fed. Exp. Corp.*, 552 U.S. at 406.

Construing Cato's Charge with the "utmost liberality", *Balas*, 711 F.3d at 408, the Court concludes that plaintiff's allegations regarding Crenny and Hamilton in her Complaint are reasonably related to her allegations in the Charge. In the Charge, plaintiff alleges that she was subject to differential discipline because of her Instagram use and "was discharged for posting

pictures on Instagram on the company property." ECF 9-2 at 2. She did not identify who imposed the discipline or was otherwise involved in monitoring her Instagram account. But, in the Complaint, Cato identifies Crenny and Hamilton as the ones who "monitored Plaintiff's Instagram account, attempting to find content to use against her." ECF 2, ¶ 14. She essentially recounted the same incident in her Charge.

Plaintiff's allegations in her Charge provided notice to the defendant that she was complaining about conduct of defendant's employees in regard to her Instagram use, the differential discipline, and her ultimate termination. Indeed, the use of Instagram comprises a central element of the narrative portion of the Charge. That Cato did not name the individuals in the Charge does not require the Court to ignore the allegation in the Complaint. The Charge does not "reference different time frames, actors, and discriminatory conduct than the central factual allegations in [the] formal suit[.]" *Chacko*, 429 F.3d at 506.

Of import, "[a] claimant is not required . . . to list every instance of purported discrimination in [her] administrative charge in order to exhaust [her] remedies[.]" *Wandji v. Wilkie*, MGB-18-03036, 2020 WL 13683715, at *3 (D.S.C. Mar. 9, 2020) (quoting *Sydnor*, 681 F.3d at 594–95); *see Huntley-El v. Broadway Servs. LLC*, JMC-24-01956-JMC, 2024 WL 4932581, at *3 (D. Md. Dec. 2, 2024) ("Plaintiffs are . . . not required to detail their claims explicitly and precisely to the EEOC in order to exhaust their administrative remedies."), *aff'd*, No. 24-2265, 2025 WL 1218993 (4th Cir. Apr. 28, 2025). Rather, "the touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related,' not precisely the same[.]" *Sydnor*, 681 F.3d at 595 (citation omitted).

Embracing defendant's interpretation of exhaustion would create a draconian exhaustion requirement that flies in the face of the liberal construction the Court must accord to an EEOC

claimant.   Accordingly, in evaluating the sufficiency of Cato's Complaint, I will consider the conduct of Crenny and Hamilton with respect to allegations concerning Cato's Instagram usage.

### 2.   Race Discrimination

Defendant observes that the "Charge explicitly states that Plaintiff was alleging discrimination based on her status as transgender *only*: 'I believe I have been discriminated against because of my *sexual identity– Transgender, Gender Identity,* in violation of Title VII of the Civil Rights Act of 1964, as amended with respect to being discharged and retaliated against.'"   *Id.* (quoting ECF 9-2 at 2) (emphasis in original).   As to plaintiff's claims of race discrimination, defendant argues: "Nowhere does Plaintiff's Charge reference race discrimination or even identify Plaintiff's race."   ECF 9-1 at 12.   Further, defendant asserts: "Although the Charge references the term 'ghetto,' there is no allegation in the Charge that this term was used in the context of race or that Plaintiff's race (which is not even identified in the Charge) was discussed in any way."   *Id.*; *see also* ECF 17 at 5.

Plaintiff disputes defendant's characterization of the facts alleged in the Charge.   ECF 14 at 8–9.   Cato notes that the word "ghetto" is a "racially loaded remark[.]"   *Id.* at 8.   Therefore, she asserts that her claims of discrimination and retaliation based on race are "reasonably related to the facts pled" in her Charge and "would naturally fall within the scope of a reasonable investigation."   *Id.*   Plaintiff reasons: "An investigation of discriminatory discharge and retaliation, triggered by management conduct and Plaintiff's internal complaints, would reasonably examine racially derogatory remarks by decisionmakers, patterns of differential treatment, and the workplace context that culminated in termination."   *Id.* at 8–9.   Furthermore, plaintiff claims that "[a]t minimum, any 'scope' dispute is fact-intensive and should not be resolved against Plaintiff on the pleadings."   *Id.* at 9.

Courts have recognized that the word "ghetto" can be racially charged and reflects "a level of racial hostility." *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) [14]; *see White v. Gov't Emps. Ins. Co.*, 457 F. App'x 374 (5th Cir. 2012) (finding that "use of the terms 'ghetto' and 'FEMA trailer' may have been 'racially inappropriate'") (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007)); *Harrington v. Disney Reg'l Ent., Inc.*, 276 F. App'x 863, 867 n.2 (11th Cir. 2007) ("The evidence shows that 'ghetto' was slang often, if not exclusively, used to refer to African Americans."); *Montgomery v. McDonough*, 682 F. Supp. 3d 1, 11 (D.D.C. 2023) ("The word 'ghetto' has racial connotations."); *Douglas v. Alfasigma USA, Inc.*, SCS-19-2272, 2022 WL 18027518, at *19 (N.D. Ill. Dec. 30, 2022) ("Drawing a reasonable inference in [plaintiff's] favor, [defendant's employee's] use of 'ghetto' may have been a racially offensive term for predominantly black neighborhoods."); *Williams v. Camden USA, Inc.*, AJB-19-691, 2021 WL 6066115, at *6 (S.D. Cal. Feb. 19, 2021) ("[T]he Court finds that the common understanding of the word ghetto, coupled with [defendant's employee] directing that word at [one of the plaintiffs], one of few African-American tenants in a complex with a majority of Caucasian residents, . . . is highly indicative of discriminatory animus against Plaintiffs."); *Daniel v. ABM Indus., Inc.*, RA-16-1300, 2017 WL 1216594, at *10 (S.D.N.Y. Mar. 31, 2017) (finding that use of the word "ghetto," combined with reference to security guards as "'unprofessional, rude, disrespectful, dirty street thugs' who 'walk around with headphone[s] in their ears and pants down their waist' proved the use of "language with racial overtones . . . sufficient to state a claim for discrimination.") (quoting the complaint); *James v. Lane*, BAJ-12-00523, 2014 WL 4809272, at

---

[14] In *Mosby-Grant,* 630 F.3d at 330, plaintiff did not claim that the term "ghetto" was used in a derogatory manner towards African Americans.  Rather, plaintiff, a police recruit, heard other recruits "refer to singer Britney Spears as 'white trash' and 'ghetto.'" *Id.*

*7 (M.D. La. Sept. 26, 2014) ("[Defendant's] use of the terms 'monkey' and 'ghetto' were 'racially inappropriate[.]'") (quoting *Turner*, 476 F.3d at 348).

Merriam-Webster Dictionary also sheds light on the usage of the term: "In the U.S., the adjective *ghetto* is strongly associated with racist attitudes toward the people who live in underprivileged city districts. Although the use of *ghetto* by and among residents of such districts may be considered neutral, its use by outsiders—particularly to disparage someone or something as being typical of such a place or person—is understood to be offensive." *Ghetto*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/KAY5-LPKL (last accessed May 11, 2026) (emphasis in original).

Plaintiff specifies in the Charge that the owner of Mission Rock is a "White Male" and that Flynn is a "White Female[.]" ECF 9-2 at 2. Plaintiff alleged in the Charge that her regional manager, Flynn, asked her if she was "ghetto." Given the racialized connotation of the word "ghetto," the allegation was enough to put the EEOC on notice of plaintiff's race-based discrimination claim. *See* ECF 9-2 at 2. Although plaintiff's description of racially insensitive conduct in the Charge is skeletal, I reject defendant's contention that the Charge fails to indicate a claim of racial discrimination.

Accordingly, plaintiff's claims of race discrimination under Title VII (Count I) and MFEPA (Count III) were adequately exhausted.

### 3. Sexual Orientation, Transgender Status, and Gender Identity

As noted, the Charge states, ECF 9-2 at 2 (emphasis added):

I believe I have been discriminated against because of my *sexual identity–Transgender, Gender Identity,* in violation of Title VII of the Civil Rights Act of 1964, as amended with respect to being discharged and retaliated against.

With respect to plaintiff's claims of discrimination on the basis of sexual orientation, defendant asserts: "Nowhere in the Charge does Plaintiff reference sexual orientation or identify her sexual orientation." ECF 9-1 at 13; *see* ECF 17 at 5. Instead, defendant asserts that the Charge "alleges discrimination based on" Cato's "gender identity (transgender) *only.*" ECF 9-1 at 13. (emphasis in original); *see* ECF 17 at 5. In particular, as to MFEPA, defendant claims that "sexual orientation is a separate and distinct protected status from gender identity, and even sex." ECF 9-1 at 13; *see* ECF 17 at 5–6. Accordingly, defendant maintains that because plaintiff did not allege discrimination based on sexual orientation in her Charge, she has failed to exhaust her administrative remedies as to that claim. ECF 9-1 at 14.

As to plaintiff's claim of discrimination on the basis of sex, defendant argues that "nowhere in her Charge did Plaintiff allege" that she was subject to sexist remarks, as alleged in the Complaint (ECF 2, ¶ 22). ECF 9-1 at 14 . Furthermore, defendant points out that in the Charge plaintiff did not "even claim that her sex is female." *Id.*

Plaintiff counters that under *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), "discrimination because of sexual orientation and transgender status is discrimination because of sex, and the exhaustion inquiry turns on whether those facts would be investigated as sex-based discrimination–not on whether a charging party used perfect labels." ECF 14 at 9. According to plaintiff, her "Charge expressly alleges transgender/gender-identity discrimination and retaliation; any references to sexual orientation in the Complaint provide factual context and evidence of sex-based animus, not a separate unexhausted theory." *Id.* Further, plaintiff asserts: "To the extent the Court treats sexual orientation as a distinct protected category under MFEPA for exhaustion purposes, Plaintiff's Title VII and MFEPA claims based on gender identity and retaliation remain exhausted and independently sufficient to proceed." *Id.*

As a preliminary matter, an individual of any gender can be subjected to sex discrimination. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("Title VII's prohibition of discrimination 'because of . . . sex' protects men as well as women[.]")  And, as stated, Cato claimed in her Charge that she had "been discriminated against because of [her] sexual identity–Transgender, Gender Identity[.]"  ECF 9-2 at 2.  The fact that Cato did not explicitly identify her sex in the Charge does not render her claim of discrimination on the basis of sex unexhausted.

In *Bostock*, 590 U.S. 644, the Supreme Court said that Title VII forbids discrimination on the basis of sexual orientation or gender identity because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  The Supreme Court understood employment discrimination on the basis of an employee's sexual orientation or gender as a species of sex discrimination.  *Id.* at 681.  Accordingly, the Court ruled: "An employer who fires an individual merely for being gay or transgender defies the law."  *Id.* at 683.  After *Bostock,* the "protections extended by Title VII and MFEPA apply with equal force to discrimination based on sexual orientation or gender identity."  *Williams-Johnson v. Paris Foods Corp.*, RDB-24-1197, 2025 WL 2257617, at *4 n.3 (D. Md. Aug. 7, 2025); *see Zinski v. Liberty Univ., Inc.*, 777 F. Supp. 3d 601, 612 (W.D. Va. 2025).

In the Charge, plaintiff specifically identifies three bases of sex discrimination: (1) "sexual identity"; (2) "Transgender"; and (3) "Gender Identity".  ECF 9-2 at 2.  Defendant seems to construe these three terms as synonyms.  ECF 9-1 at 13; *see id.* at 13–14.  Although plaintiff used three different terms to allege that defendant discriminated against her, defendant seems to suggest that only one—that Cato is transgender—has any legal significance.

In effect, defendant asks the Court to ignore the two other terms.  But, "the same term usually has the same meaning and different terms usually have different meanings."  *Pulsifer v.*

*United States*, 601 U.S. 124, 149 (2024) (discussing this "generally useful—but still 'defeasible'—interpretive principle" in the context of statutory interpretation) (quoting A. Scalia & B. Garner, Reading Law 170–171 (2012)).  And, as stated, the Charge must be construed "with utmost liberality." *Balas*, 711 F.3d at 408.  Moreover, "a plaintiff is not bound solely to the label [s]he applies to the discrimination complained of." *Fowler v. Caesars Virginia, LLC*, TTC-24-00029, 2025 WL 673654, at *4 (W.D. Va. Mar. 3, 2025).  As plaintiff puts it, she need not use "perfect labels."  ECF 14 at 9.

Cato, a transgender woman, asserted in the Charge that defendant discriminated against her on the basis of her "sexual identity", "gender identity", and because she is "transgender[.]" ECF 9-2 at 2.  Sexual identity is a term that is used interchangeably with sexual orientation.  *See Glossary of LGBTQIA+ Terms: Why Language Matters,* PSYCHCENTRAL, https://perma.cc/4NXC-KJBC (last accessed May 13, 2026) ("A person's sexual identity or sexual orientation describes who they are sexually attracted to.  *Sexuality is separate from gender identity*.") (Emphasis added). The American Psychological Association ("APA") Dictionary of Psychology defines "sexual identity" as "an individual's sexual orientation" or as "an occasional synonym for sex identity[.]"[15] *Sexual Identity*, APA DICTIONARY OF PSYCHOLOGY, https://perma.cc/2KM3-BZER (last accessed May 13, 2026).  Some scholars ascribe a broader meaning to sexual identity, defining the term as "the 'social meaning' of sexual orientation[.]"  *See, e.g.,* Matthew Andler, *The Sexual Orientation/Identity Distinction,* CAMBRIDGE UNIV. PRESS (2021), https://perma.cc/62QQ-MZFS (last accessed May 13, 2026).  In my view, plaintiff's statement in the Charge that she was

---

[15] The APA Dictionary defines "sex identity" as "the purely biologically determined sexual status of an individual as male, female, or intersex."  *Sex Identity*, APA DICTIONARY OF PSYCHOLOGY, https://perma.cc/T259-WKYE (last accessed May 13, 2026).

discriminated against based on her sexual identity is sufficient to constitute an allegation of discrimination on the basis of sexual orientation.  *See* ECF 9-2 at 2.

The Merriam-Webster Dictionary defines "gender identity" as " a person's internal sense of being male, female, some combination of male and female, or neither male nor female[.]" *Gender Identity,* MERRIAM-WEBSTER DICTIONARY, https://perma.cc/N6Z4-ZBQV (last accessed May 19, 2026).  The Dictionary defines "transgender" to mean "of, relating to, or being a person whose gender identity differs from the sex the person was identified as having at birth[.]" *Transgender,* MERRIAM-WEBSTER DICTIONARY, https://perma.cc/Y4DE-HZZK (last accessed May 19, 2026).

Discrimination on the basis of gender identity and transgender status are different forms of sex discrimination.  *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) ("discrimination against a person for being transgender is discrimination 'on the basis of sex.'"); *J. Doe v. Univ. of Maryland, Baltimore*, JRR-25-02242, 2026 WL 923334, at *3 (D. Md. Apr. 6, 2026) ("[D]iscrimination based on gender identity is a form of discrimination 'on the basis of sex.'"); *O.R. v. Greenville Cnty*, DCC-25-02599, __ F. Supp. 3d __, 2026 WL 815913, at *13 (D.S.C. Mar. 19, 2026) ("Governmental action that discriminates on the basis of *sex, transgender status, or gender identity* must be found unconstitutional 'unless [it is] substantially related to a sufficiently important governmental interest.'") (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020)) (emphasis added; alterations in *Grimm*); *Gilliam v. Dep't of Pub. Safety & Corr. Servs.*, MJM-23-1047, 2024 WL 5186706, at *19 (D. Md. Dec. 20, 2024) (same).

Cato has exhausted administrative remedies as to both types of sex discrimination.  Cato's allegation in her Charge that she was discriminated against on the basis of her gender identity could have reasonably led to an investigation into whether she suffered discrimination on the basis

of being transgender or because she is a woman or both.  Accordingly, by claiming in the Charge that Cato was discriminated against on both bases, gender identity and transgender status, plaintiff has exhausted her claims of gender discrimination and discrimination based on transgender status.

In sum, under both Title VII and MFEPA, Cato has exhausted her claims of discrimination based on gender identity, sexual orientation, and transgender status.

### 4.  Hostile Work Environment

In the Charge, as noted, plaintiff asserts, ECF 9-2 at 2 (emphasis added):

*My regional manager Jane Flynn (White Female) asked me if I was 'ghetto.'*  I sent an email to the owner Andy (White Male) and to HR manager Carolyn Reynolds about the way my manager talked to me in email and in person, *she has used vulgar language towards me.*  Nothing was done.

Defendant urges dismissal of any hostile work environment claim, asserting that the Charge "makes no mention of harassment or hostile work environment."  ECF 9-1 at 14–15.  Rather, defendant contends that "the Charge simply alleges that Plaintiff was terminated on December 5, 2023, because she is transgender and in retaliation for a complaint that she had made about how Ms. Flynn allegedly spoke to her."  *Id.* at 15.  Defendant also claims that plaintiff's Charge is narrow in scope because "she listed December 5, 2023 (the date on which she was terminated) as the only date on which any discrimination took place" and "the fact that she stated only that she was discriminated against 'with respect to being discharged and retaliated against.'"  *Id.* (quoting ECF 9-2 at 2).  Furthermore, defendant claims that "the Charge alleges only that Jane Flynn asked Plaintiff if she was 'ghetto' and used unidentified vulgar language toward Plaintiff."  ECF 17 at 6.  According to defendant, "[t]he termination of Plaintiff's employment was a discrete act, and discrete acts do not form the basis of a hostile work environment claim."  ECF 9-1 at 15.

Plaintiff counters that "[w]hether styled as a standalone hostile work environment theory or as evidence supporting Plaintiff's discrimination and retaliation claims, the harassment

allegations are reasonably related to–and would naturally arise from–a reasonable investigation into the Charge's complaint about hostile/vulgar treatment by management and the culminating discharge." ECF 14 at 9–10.  According to plaintiff, a "reasonable investigation into the charged discriminatory discharge and retaliation would naturally examine whether Plaintiff was subjected to discriminatory intimidation and ridicule as part of the same course of conduct leading to discharge." *Id.* at 10.

Notably, "courts do not require a plaintiff to have invoked a hostile work environment claim by name or to use specific 'magic words' in order to exhaust it.  But typically the plaintiff must offer at least *some* suggestion of a hostile work environment in the charge narrative, such as by referring to an ongoing pattern of conduct or describing a workplace pervaded by abuse." *Congress v. District of Columbia*, 324 F. Supp. 3d 164, 171 (D.D.C. 2018) (internal citation omitted) (emphasis in original); *see also, e.g.*, *Kenion v. Skanska USA Building, Inc.*, RDB-18-3344, 2019 WL 4393296, at *6-7 (D. Md. Sept. 13, 2019) (finding no exhaustion when "charge does not mention harassment and is devoid of a single reference to conduct which could give rise to a hostile work environment claim"); *Byington v. NBRS Financial Bank*, 903 F. Supp. 2d 342, 351 (D. Md. 2012) (finding that "generalized allegation of 'harassment' in the administrative charge" was "void of the specifics necessary to put [the defendant] on notice").

An allegation of repeated use of offensive language in the workplace is enough to conclude that an administrative investigation into a hostile work environment "can reasonably be expected to follow the charge of discrimination." *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981); *see e.g., Fowler*, 2025 WL 673654, at *3–4 (finding that plaintiff, a Black man, exhausted his hostile work environment claim when he alleged in his EEOC charge that a shift manager repeatedly used "the term 'boy' when addressing him, which he was forced to endure for 'weeks'",

the same person "'would make off-handed remarks to [plaintiff], often singling out Black customers and employees unnecessarily'"; and plaintiff was subjected to "'belittling treatment'") (quoting EEOC charge); *Bott v. U.S. Airways, Inc.*, FDW-09-113, 2009 WL 1686801, at *3 (W.D.N.C. June 15, 2009) (finding that plaintiff had exhausted a hostile work environment claim when she alleged in her EEOC charge that she "'was subjected to intimidating and discouraging comments and hostile gestures by male co-workers.'").

Cato describes a specific incident in which her manager asked her if she was "ghetto." She also claimed that her manager subjected her to "vulgar language," which Cato reported to the owner and HR manager of Mission Rock, but "[n]othing was done." ECF 9-2 at 2. Based on Cato's allegations that her manager used vulgar language "towards" her, along with her specific allegation that her manager used a racially hostile term, an investigation into a hostile work environment claim "would naturally have arisen from an investigation" into Cato's allegations in the Charge. *See Chacko,* 429 F.3d at 509. Accordingly, I am satisfied that plaintiff has exhausted a claim of hostile work environment.

### B. Timeliness

Defendant notes that a charge is timely only if it is filed no later than 300 days after the alleged discriminatory conduct. ECF 9-1 at 9 (citing 42 U.S.C. § 20000-5(e)(1); S.G. § 20-1004(c)(2)(i)). Conversely, discriminatory conduct that occurred more than 300 days before a charge is filed is not timely. ECF 9-1 at 9. MFEPA provides two years to file a charge of harassment. ECF 9-1 at 9 n.3 (citing S.G. § 20-1004(c)(3)(i)).

Mission Rock asserts that because "Plaintiff filed her Charge on April 16, 2024," only allegations of "purported discriminatory conduct or retaliation that occurred ***on or after June 21, 2023*** (300 days prior to April 16, 2024) are timely under Title VII and FEPA." ECF 9-1 at 9

(emphasis in original).  Defendant notes that in the Complaint, plaintiff alleges "that on an unspecified date in June 2023, Jodian Hamilton told Plaintiff that in Jamaica, Plaintiff's lifestyle was considered sinful and Plaintiff was 'going to hell' for her 'lifestyle.'"  *Id.* at 10 (quoting ECF 2, ¶ 9).  Defendant asserts that because the Complaint "does not identify the date in June 2023 on which this comment was allegedly made," it "does not sufficiently allege that the comment was made after June 21, 2023, during the 300-day limitations period."  ECF 9-1 at 10.

Plaintiff contends that the "timeliness argument is not a basis to dismiss any count at the pleading stage."  ECF 14 at 4.  First, plaintiff notes that the majority of conduct on which she relies in her Complaint occurred after June 21, 2023.  *Id.* at 4–5.  Second, Cato asserts that, "to the extent Defendant seeks to exclude the June 2023 Pride Month remark based on the absence of an exact date . . . any ambiguity must be resolved in Plaintiff's favor on a Rule 12(b)(6) motion."  *Id.* at 5 (citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)).  And, plaintiff argues that, "even if some discrete acts predate June 21, 2023, they remain relevant as background evidence supporting timely claims, and the Court should not excise such factual context at the pleading stage."  ECF 14 at 5 (citing *Nat'l R.R. Passenger*, 536 U.S. at 113).

Hamilton's alleged remark occurred on an unspecified day in June of 2023.  Accordingly, plaintiff has not plausibly alleged that Hamilton made this comment within the statutory period, *i.e.*, after June 21, 2023.  Therefore, Hamilton's comment cannot constitute a standalone basis for the discrimination claims (Counts I and III).

As to Cato's hostile work environment claim (Count I), "[a] hostile work environment exists only when the workplace is so 'permeated with discriminatory intimidation, ridicule, and insult,' that it 'would reasonably be perceived, and is perceived, as hostile or abusive.'"  *Robinson*, 70 F.4th at 781 (quoting *Harris*, 510 U.S. at 21 (internal citations removed)); *see also Laurent-*

*Workman*, 54 F.4th at 210 (quoting *Harris*, 510 U.S. at 21). "The continuing violation theory allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination, i.e., when the incidents make up part of a hostile work environment claim." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007); *see Morgan*, 536 U.S. at 117 ("It does not matter . . . [if] some of the component acts of the hostile work environment fall outside the statutory time period.") Under the continuing violation theory, "[i]f one act in a continuous history of discriminatory conduct falls within the charge filing period, then acts that are plausibly or sufficiently related to that act which fall outside the filing period may be considered for purposes of liability." *Lewis v. Norfolk S. Corp.*, 271 F. Supp. 2d 807, 812 (E.D. Va. 2003).

Accordingly, to the extent plaintiff seeks to support her claim of a hostile work environment, by reliance on conduct that occurred prior to June 21, 2023, she is not necessarily barred from doing so. In *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977), the Court said: "A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences."

### C. Failure to State a Claim

Even assuming exhaustion, defendant posits that plaintiff "fails to state claims of discrimination, hostile work environment, and retaliation." ECF 9-1 at 17. On this basis, defendant urges the Court to dismiss the Complaint. *Id.*

### 1.  Discrimination (Counts I and III)

As stated, plaintiff lodges claims of discrimination under Title VII (Count I) and MFEPA (Count III) on the basis of her race, gender, sex, and sexual orientation.  "To state a Title VII discrimination claim, a plaintiff must allege facts sufficient to raise a right to relief above the speculative level.  In pertinent part, Title VII prohibits an employer from refusing to hire . . . or otherwise . . . discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race or sex."  *Barnhill,* 138 F.4th at 131 (cleaned up and citation omitted); *see Bing*, 959 F.3d at 616–17.

Defendant mistakenly claims that for plaintiff's Complaint to survive she must adequately allege a prima facie case of discrimination, *i.e.*, that she: "(1) is a member of a protected class; (2) performed her job satisfactorily; (3) suffered an adverse employment action; and (4) was treated differently from similarly situated employees outside the protected class."  ECF 9-1 at 17–18.  But, as discussed earlier, the "prima facie case . . . is an evidentiary standard, not a pleading requirement."  *Swierkiewicz*, 534 U.S. at 510.  Therefore, Cato "need not plead a prima facie case of discrimination" to survive a motion to dismiss.  *Id.* at 515.  Rather, she need only assert facts that, if true, state a claim for relief.  *Johnson*, 163 F.4th at 819.  Accordingly, defendant's contention that plaintiff's Complaint fails because she has not alleged a prima facie case of discrimination misses the mark.  *See* ECF 9-1 at 18-22.[16]

Defendant also argues that plaintiff does not sufficiently allege facts that, if proved, would show that  she performed her job satisfactorily or that she suffered an adverse employment action,

---

[16] Defendant cites, *inter alia*, *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 203 (4th Cir. 2019), to support its position.  ECF 9-1 at 18.  There, the Fourth Circuit affirmed the district court's grant of *summary judgment* to defendant as to plaintiff's Title VII claims of disparate treatment, hostile work environment, constructive discharge, and retaliation.

other than the actual termination of employment. *Id.* at 18–20. Further, defendant contends that Cato does not sufficiently allege comparator information or otherwise assert facts to show that she was terminated or subject to other unlawful action because of her race, sex, sexual orientation, or gender identity. *Id.* at 20–22.

As to the remarks on which plaintiff relies to support her claims of discrimination, defendant argues that these statements are insufficient "to support an inference of discrimination[.]" ECF 17 at 10. Defendant notes that "there is no allegation that Ms. Flynn referenced Plaintiff's race when she allegedly made the 'ghetto' comment." *Id.* Further, defendant argues: "The Opposition also argues Plaintiff was told that she was 'going to hell' for her 'lifestyle,' but there is no allegation that anyone at Mission Rock even knew that Plaintiff was transgender or knew her sexual orientation (and, in fact, the Complaint does not even allege what Plaintiff's sexual orientation is)." *Id.* Furthermore, defendant argues that "the Complaint does not allege any facts to suggest a nexus between the alleged discriminatory remarks and the termination of Plaintiff's employment or any other alleged act." *Id.* Defendant claims that in the Complaint, plaintiff alleges she was fired "for leaving work early on December 2, 2023" and that she "was terminated for posting on Instagram on company property." *Id.* at 11. Thus, defendant states: "There are absolutely no allegations in the Complaint that plausibly suggest that Plaintiff was terminated because of her race, sex, sexual orientation, or gender identity[.]" *Id.*

Plaintiff counters that her "Complaint readily clears the pleading bar." ECF 14 at 11. She asserts: "The Fourth Circuit has emphasized that at the pleading stage, the Court's task is not to decide whether discrimination occurred, but whether the alleged facts permit a reasonable inference of discrimination or retaliation." *Id.* (citing *Woods v. City of Greensboro*, 855 F.3d 639, 647–48 (4th Cir. 2017)). According to Cato, she has pled facts that "plausibly support an inference

of discrimination", citing her "[a]llegations of discriminatory remarks by supervisors/decisionmakers, differential discipline, escalating hostility, and a pretextual termination[.]" ECF 14 at 12.

To be clear, and as stated, a plaintiff must assert facts that, if proven, would establish a particular claim. Here, plaintiff must allege "sufficient facts to make it plausible that (1) she suffered an adverse employment action, and (2) the action was because of" a protected status under Title VII. *Franovich*, 687 F. Supp. 3d at 683. In other words, as with all "discrimination cases, whether for disparate treatment or hostile work environment," there must be "some connective thread between the alleged mistreatment and the protected status, in order to state an "actionable claim for discrimination." *Gough v. Rock Creek Sports Club*, PJM-19-3533, 2021 WL 795447, at *2 (D. Md. Mar. 2, 2021). "At the motion to dismiss stage, however, the connective thread may be reasonably inferred from the facts alleged in the complaint." *Hartle v. Transplant Genomics, Inc.,* RDB-24-3215, 2025 WL 2676536, at *6 (D. Md. Sept. 18, 2025).

Notably, "termination is the quintessential adverse employment action." *Timbers v. Telligent Masonry, LLC*, JKB-21-00293, 2022 WL 861849, at *6 (D. Md. Mar. 23, 2022). Plaintiff alleges that she was terminated unlawfully, that the "reasons given for her termination" were "false", ECF 2, ¶ 41, and that the reasons were "a pretext for discrimination and retaliation." *Id.* ¶ 26. Therefore, plaintiff has plausibly alleged that she suffered an adverse employment action.

In addition, Cato must plausibly allege that she was terminated because of her race, sex, sexual orientation, and/or transgender status. *See Franovich*, 687 F. Supp. 3d at 683. In general, "evidence of alleged discriminatory animus" can "create[] an inference that wrongful discrimination motivated" a plaintiff's "termination[.]" *Brown v. Dir. SCDC*, BHH-08-3761, 2010 WL 3167332, at *7 (D.S.C. May 28, 2010), *report and recommendation adopted,* HFF-08-3761,

2010 WL 3167331 (D.S.C. Aug. 5, 2010).   Indeed, "[r]emarks may raise an inference of discrimination if there is a nexus between the remarks and an adverse employment decision." *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015); *see Ridgell v. Astrue,* DKC-10-3280, 2012 WL 707008, at *11 (D. Md. Mar. 2, 2012) ("Although 'stray or isolated statements' may not qualify as direct evidence in employment discrimination actions, derogatory remarks demonstrating 'some nexus . . . between the alleged discriminatory statements and any of the employment decisions made by the [employer]' will suffice.") (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 549 (4th Cir. 1995), *rev'd on other grounds,* 517 U.S. 308 (1996)); *Collins v. Landmark Mil. Newspapers, Inc.*, HCMJ-06-342, 2007 WL 2301549, at *17 (E.D. Va. Aug. 6, 2007) ("Isolated derogatory comments will not suffice to establish either a discriminatory attitude or a nexus to the employment action."); *Byrd v. Safeway, Inc.*, AW-99-332, 2000 WL 964773, at *6 (D. Md. June 16, 2000) ("Stray workplace remarks, without a clearly demonstrated link to the adverse employment action are not sufficient.")

Cato claims that her termination on December 5, 2023, allegedly for leaving work early, was actually a "pretext for discrimination." *See* ECF 2, ¶ 26.   She asserts that "[a]round September 13, 2023," Flynn "asked Plaintiff whether she was 'ghetto', a racially charged term, and questioned if she took offense to the term . . . she further stated that the company does not tolerate 'ghetto people'." ECF 2, ¶ 10.   In addition, Cato alleges that she "reported the racist comments to the owner of the property, Mr. Andy Tsangarides, and HR Manager Carolyn Reynolds, but no corrective action was taken." *Id.* ¶ 12.   Then, she "filed her first complaint with defendant's HR office on October 4, 2023, opposing the discriminatory practices" of Mission Rock.  *Id.* ¶ 18.

With respect to plaintiff's termination, she asserts that "three months after filing the [HR] complaint," she "was assigned to work alone on a Saturday, December 2, 2023, from 9:00 a.m. to

5:00 p.m." *Id.* ¶ 23.  Because plaintiff had a "heavy workload" on that day, she "did not take a lunch break during her work shift." *Id.*¶ 24.  Then, "[a]t approximately 4:00 p.m., she used the restroom and did not return to her desk, effectively using that time as her lunch hour." *Id.*  Three days later, Mission Rock terminated plaintiff, "allegedly for leaving work early[.]" *Id.* ¶ 26.

Flynn's use of the word "ghetto" almost three months before Cato's termination is not sufficient to create the requisite nexus to discrimination based on sex, sexual orientation, or transgender identity.  To be sure, as discussed, "ghetto" may have a racially hostile meaning.  But, the use of the word during a single conversation, which took place almost three months before plaintiff's termination, is insufficient to support an inference that plaintiff was terminated because of her race.

Indeed, courts faced with allegations of the use of even more egregious language have held that the sporadic use of racial epithets, without more, is "insufficient to give rise to a reasonable inference that [plaintiff's] termination was racially discriminatory." *Johnson v. Angels*, 125 F. Supp. 3d 562, 567 (M.D.N.C. 2015) (dismissing plaintiff's discriminatory discharge claim when plaintiff's employer "repeatedly used the word 'n* * * * * '  in her presence and referred to her as a 'pickaninny'" because plaintiff had "not alleged any facts to suggest a nexus between [the employer's] racially discriminatory remarks and [plaintiff's] termination."); *see Haggood v. Rubin & Rothman, LLC,* SJF-14-34, 2014 WL 6473527, at *11 (E.D.N.Y. Nov. 17, 2014) ("Although the challenged comments are undoubtedly racially offensive and discriminatory, the amended complaint alleges only that two (2) of [plaintiff's] co-workers uttered those comments on four (4) occasions over an approximate thirty-three (33)-month period ending in July 2011, more than one (1) year prior to any purported adverse employment action being taken against her."); *Baysmore v. Potomac Elec. Power Co.*, DKC-06-0218, 2007 WL 9782576, at *5 (D. Md. June 25, 2007)

("An atmosphere of discrimination alone, especially when alleged only in general terms, does not, without more, support an inference that Plaintiff's termination was based on his race.").

In support of plaintiff's discrimination claims, she also maintains that she was subjected to "heightened scrutiny [and] differential discipline" (ECF 14 at 11), "including being disciplined for Instagram while other employees were not." *Id.* at 12. In particular, plaintiff alleges: "Ms. Hamilton and Ms. Crenny monitored Plaintiff's Instagram account, attempting to find content to use against her . . . . Plaintiff was disciplined for posting on Instagram, despite other employees doing so without consequence." ECF 2, ¶ 14. Even assuming the alleged conduct qualifies as an adverse employment action, the only nexus plaintiff offers between race discrimination and these acts is Flynn's use of the word "'ghetto'" twice in a single conversation. For the reasons stated, those comments alone fail to create a plausible nexus between plaintiff's race, her subsequent treatment in the office, and her termination.

I also conclude that plaintiff has not stated a claim of discrimination on the basis of her sex, sexual orientation, or transgender status. Plaintiff alleges that Hamilton, who is from Jamaica, told Cato in June of 2023 that "in her country, [Cato's] lifestyle was considered sinful, and she was 'going to hell' for her 'lifestyle,'" a comment plaintiff contends referred to Cato's "gender identity and sexual orientation." ECF 2, ¶ 9. Furthermore, plaintiff claims that "[a]round mid-October 2023, Plaintiff was subjected to sexist remarks and was told by Ms. Hamilton that certain tasks should be done by a man." *Id.* ¶ 22.

Even assuming the Court could consider the alleged June 2023 remark, these two comments are insufficient to create a plausible nexus between Cato's termination and sex-based animus based on Cato's gender, sexual orientation, or gender identity. Hamilton made the statement to Cato about her lifestyle about six months before Cato's termination. And, Hamilton's

second remark came two months before Cato's termination.  The two remarks are isolated and not temporally related to the termination.  *See Meisner v. Zymogenetics, Inc.,* CMC-12-00684, 2014 WL 4721680 (D.S.C. Sept. 22, 2014) (finding that plaintiff's claim of gender discrimination failed on the basis of three allegedly sexist remarks because "unless connected with the employment decision at issue, isolated comments cannot constitute evidence of the discriminatory animus necessary to establish a Title VII claim"); *Harris v. Home Sales Co*., 499 F. App'x 285, 291 (4th Cir. 2012) ("[W]e have made clear that 'stray or isolated' remarks are insufficient to prove discrimination, *see, e.g., Merritt,* 601 F.3d at 300, absent some actual relationship to the adverse employment actions under challenge."); *but see Marshall v. Accomack Cnty. Dep't of Pub. Safety,* RAJ-25-255, 2026 WL 181485, at *1, *5 (E.D. Va. Jan. 22, 2026) (concluding that plaintiff's "allegations plausibly suggest Plaintiff was treated unfairly at work based on her sex, and that those biases ultimately contributed to her termination"; plaintiff claimed that she was subjected to an unwelcome request to go on a date by a co-worker five months before her termination, and upon reporting the incident to her supervisor was blamed, belittled, and the supervisor spread rumors about plaintiff to co-workers that she had "engaged in sexual relationships with other co-workers and that Plaintiff should 'close her legs and do her job.'") (quoting the Complaint).

     In sum, plaintiff has not set forth facts that are sufficient to take her allegation that Mission Rock terminated her on the basis of her race, sex, sexual orientation, or transgender identity "across the 'line between possibility and plausibility.'"  *See Squire v. Identity, Inc.*, 2022 WL 17038958 (4th Cir. Nov. 17, 2022) (per curiam) (quoting *Twombly,* 550 U.S. at 546).  Therefore, I shall dismiss these discrimination claims, without prejudice, and with leave to amend.

## 2.   Retaliation (Counts II and IV)

Defendant claims that, with respect to plaintiff's termination, she "cannot show any causal connection between her complaint to Human Resources on October 4, 2023, and her termination on December 5, 2023, two months later."   ECF 9-1 at 28.   Defendant also contends that "the Complaint does not allege any facts to establish that the individuals who made the decision to terminate" Cato "were aware of her October 4, 2023 complaint." *Id.* at 29.   Furthermore, defendant argues: "With respect to the acts in the Complaint other than termination . . . the Complaint alleges that Plaintiff was already unhappy with how her managers were treating her well before October 4th." *Id.* at 30.   And, defendant posits: "Protected activity cannot be the 'but for' cause of alleged conduct when the employee was treated the same way even before she engaged in the protected activity." *Id.* (citing *Thompson v. Potomac Elec. Power Co*., 312 F.3d 645, 651 (4th Cit. 2002)).

Cato counters: "The complaint squarely alleges protected activity, employer knowledge, and causation."   ECF 14 at 13.   As to protected activity, plaintiff points to her report of "discriminatory comments and hostile treatment to the owner and HR" and Cato's filing of an HR complaint on October 4, 2023. *Id.* at 14 (citing ECF 2, ¶¶ 12, 18).   With respect to causation, plaintiff contends that she alleges "escalating hostility and differential discipline, followed by termination on December 5, 2023–roughly two months later."   ECF 14 at 14 (citing ECF 2, ¶¶ 19–26).   Accordingly, plaintiff reasons: "Temporal proximity combined with allegations of escalating retaliatory conduct supports causation at the pleading stage."   ECF 14 at 14. Furthermore, plaintiff asserts that she "alleges post-termination retaliation: eviction from employer-provided housing and interference with unemployment benefits through a false claim that Plaintiff 'resigned.'" *Id.* (citing ECF 2, ¶¶ 27, 28).

As discussed, to state a retaliation claim, plaintiff must "plead facts plausibly alleging: "(1) that [she] engaged in a protected activity, (2) that [Mission Rock] took an adverse action against [her], and (3) that there was a causal link between the two events." *Piscitelli*, 2026 WL 936898, at \*2.   By filing a complaint with HR on October 4, 2023, "opposing" Mission Rock's "discriminatory practices," ECF 2, ¶ 18,[17] plaintiff engaged in protected activity. *See Roberts*, 998 F.3d at 122 ("Protected activity under Title VII includes complaints of discrimination based upon race, color, religion, sex or national origin. Complaints raised through internal company procedures are recognized as protected activity.") (internal quotation marks and citation omitted); *Traore v. Baltimore Police Dep't*, MJM-22-793, 2023 WL 8600553, at \*12 (D. Md. Dec. 12, 2023) ("Plaintiff's internal complaints of race discrimination constitute protected activities under Title VII."). And, plaintiff's termination was certainly an adverse employment action. *See Roberts,* 998 F.3d at 122. Accordingly, the dispute as to whether Cato has sufficiently pled a claim of retaliation depends upon the third element: causation.

Ordinarily, a lapse of two months between the filing of an HR complaint and termination of employment does not constitute sufficient temporal proximity to enable a court to infer causation. *See Haggins,* 163 F.4th at 881; *Barnhill,* 138 F.4th at 132; *see also Kelly v. Giant of Maryland LLC*, PX-18-02495, 2019 WL 2502289, at \*7 (D. Md. June 17, 2019) ("While no 'bright-line rule' dictates the temporal proximity necessary to establish causation, the United States Court of Appeals for the Fourth Circuit has found gaps of two to four months 'too long to establish a causal connection by temporal proximity alone.'") (quoting *Bishop v. Bd. of Educ. of Calvert*

---

[17] Plaintiff also alleges that she "reported the racist comments" she endured from Flynn, to "the owner of the property, Mr. Andy Tsangarides, and HR Manager Carolyn Reynolds, but no corrective action was taken." ECF 2, ¶ 12. Plaintiff does not specify on what date she made this report, or whether it was part of her October 4 complaint to HR.

*Cty.*, DKC-11-1100, 2011 WL 2651246, at *8 (D. Md. July 5, 2011), *aff'd*, 466 F. App'x 261 (4th Cir. 2012)); *Clarke v. DynCorp Int'l LLC*, JFM-12-3267, 962 F. Supp. 2d 781, 790 (D. Md. 2013) ("[A] lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'") (quoting *King*, 328 F.3d at 151 n.5)

But, as discussed, temporal proximity is not the only way a plaintiff can plausibly allege causation. *CSRA*, 12 F.4th at 417. Indeed, a plaintiff can "overcome an absence of temporal proximity" through "'evidence of recurring retaliatory animus during the intervening period' . . . ." *Massaro*, 2024 WL 1162061, at *6 (quoting *Lettieri*, 478 F.3d at 650) (cleaned up); *see Olsen v. City of Richmond*, RCY-23-475, 2025 WL 2656047, at *17 (E.D. Va. Sept. 16, 2025) ("[P]laintiff may establish a causal nexus between the adverse action and the protected conduct" by alleging "specific facts establishing retaliatory animus."); *Yancy v. Becerra*, DKC-20-0276, 2021 WL 4215332, at *8 (D. Md. Sept. 16, 2021) ("Without temporal proximity, there must be some other evidence of retaliatory animus between the protected activity and the allegedly retaliatory conduct.").

The alternative path contemplates the existence of "a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity." *Barnhill,* 138 F.4th at 132. For example, in *Olsen,* 2025 WL 2656047, at *17*,* the court found that although plaintiff had not established a temporal proximity supporting causation, she had alleged a "causal inference" based on the "intervening circumstances" between plaintiff's protected activity and an adverse employment action, a demotion. In particular, plaintiff "was placed in a foul-smelling sewage treatment plant, without HVAC, under a supervisor with whom she had previously had personal disagreements", suggesting personal malice. *Id.* Additionally, plaintiff alleged that one of the

defendant's employees who took part in the decision to demote plaintiff "showed up to Plaintiff's July 15, 2022 HR meeting and publicly mocked her, reiterating [an] accusation that Plaintiff was vindictive." *Id.* (internal quotation marks omitted).

Here, the conduct of Hamilton and Crenny falls short of establishing the requisite causation to sustain plaintiff's retaliation claim as to pre-termination conduct. Plaintiff alleges that after she filed her Complaint on October 4, 2023, the following incidents occurred:

(1) "On October 9, 202[3], following Plaintiff's complaint to HR, she requested that Ms. Hamilton provide her commission sheet to confirm that all leases necessary for her commission payout had been accounted for. Ms. Hamilton initially responded that it was unnecessary, but after repeated exchanges, she eventually agreed to provide the information, stating that she would do so just this time." ECF 2, ¶ 19;

(2) On October 9, 2023, "Ms. Crenny asked Plaintiff if there was a reason she is taking a retaliation test over – incorrectly assuming it was a retake." *Id.* ¶ 20;

(3) On October 9, 2023, "Plaintiff asked Ms. Hamilton for a ride to the company's event and Ms. Hamilton told her that she would pick her up. Then, she sent Plaintiff an email telling her that she is riding with a co-worker, so Plaintiff was forced to travel via metro to attend the event." *Id.* ¶ 21.

(4) "Around mid-October 2023, Plaintiff was subjected to sexist remarks and was told by Ms. Hamilton that certain tasks should be done by a man." *Id.* ¶ 22.

(5) "Plaintiff was assigned to work alone on a Saturday, December 2, 2023, from 9:00 a.m. to 5:00 p.m." *Id.* ¶ 23.

Of import, plaintiff does not allege that either Hamilton or Flynn were aware of Cato's HR complaint. *See* ECF 2. In a retaliation claim, there is no "causal connection between the protected activity and the adverse action" if the actor alleged to be taking retaliatory action is "without actual knowledge of the harassment or of any complaints of harassment made to the company's employees." *Roberts,* 998 F.3d at 123. Here, plaintiff has alleged no basis for assuming that the actions of Flynn or Hamilton were motivated by a desire to retaliate against plaintiff for filing an HR complaint. Additionally, the alleged conduct of Flynn and Hamilton is not as overtly hostile

as that of plaintiff's co-workers in *Olsen*, 2025 WL 2656047. And, "personal conflict alone does not constitute retaliation." *Spencer*, 919 F.3d at 208.

Furthermore, the type of conduct in which Hamilton and Flynn allegedly engaged prior to Cato filing her HR Complaint is of the same character as the conduct she alleged took place after her complaint. Cato alleges that in September 2023, before she filed her HR Complaint, Hamilton admonished her for rocking her chair during a morning meeting, "although Plaintiff was engaged in the meeting." ECF 2, ¶ 11. Cato also alleges that in September 2023, Hamilton "mocked Plaintiff for smiling" and Crenny "began laughing, making Plaintiff feel bullied for having a positive face." *Id.* ¶ 13. And, on October 2, 2023, Crenny sent Plaintiff an "email of frustration." *Id.* ¶ 17. Plaintiff also makes allegations with no specific date: (1) Hamilton and Crenny monitored her Instagram account to find content to use against her, for which Cato was disciplined, *id.* ¶ 14; (2) Crenny "would mark up" Cato's emails "and send her emails in red ink", *id.* ¶ 15; and (3) when Cato "requested assistance with work-related matters, Ms. Hamilton and Ms. Crenny frequently responded in a rude and confrontational manner." *Id.* ¶ 16.

To the extent any of this hostile treatment could be considered an adverse action against plaintiff, Crenny and Hamilton were engaging in similar behavior before plaintiff filed her HR complaint. Indeed, "where purported adverse employment actions occur both before and after the 'protected activity' a Plaintiff must establish a specific causal connection with the *post* protected activity employment action[.]" *Lambert v. Mecklenburg Cnty.*, CH-04-628, 2006 WL 2620307, at *10 (W.D.N.C. Sept. 12, 2006) (emphasis in original). Plaintiff has failed to allege any facts that would support a causal inference based on the conduct of Crenny and Hamilton.

As discussed, because plaintiff has not exhausted her administrative remedies as to her allegations of defendant's post-termination allegedly retaliatory conduct, I will not consider it in

adjudicating the Motion.  And, because plaintiff does not specify when these actions took place, it is impossible to determine whether there is temporal proximity that could support a causal nexus. *See Laughlin*, 149 F.3d at 259.

Therefore, I shall dismiss the retaliation claim, without prejudice, and with leave to amend.

### 3.   Hostile Work Environment (Count I)

Curiously, Cato did not assert a separate claim for hostile work environment. Nevertheless, in her claim for discrimination under Title VII, she alleges that "defendant's conduct created a hostile work environment[.]"  ECF 2, ¶ 41.

As discussed, to assert a plausible claim of a hostile work environment based on her race or sex, Cato must allege: "(1) she experienced unwelcome harassment; (2) the harassment was based on her gender [or] race . . . ; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer."  *Bass*, 324 F.3d at 765.  And, Cato "must also allege that her protected characteristic under Title VII was the 'but for' cause of the alleged harassment." *Laurent-Workman,* 54 F.4th at 210; *see also Hines v. LeafGuard Holdings Inc*., LKG-25-00306, 2026 WL 776078, at *9 (D. Md. Mar. 19, 2026) ("The Plaintiff must also allege that her protected characteristic under Title VII was the 'but for' cause of the alleged harassment.").

Notably, "harassment need not be accompanied by a contemporaneous statement of animus to be actionable under Title VII—rather, the connection between animus and conduct may be inferred from the totality of the circumstances."  *Strothers*, 895 F.3d at 330–31.  However, "'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' . . . does not sufficiently affect the conditions of employment to implicate Title VII."  *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 67).  Indeed, courts have repeatedly found that the occasional use of

offensive language in the workplace is not enough to create a hostile work environment. *See Pompey v. Leggett & Platt, Inc.*, LPA-09-1006, 2011 WL 238649, at *8–9 (M.D.N.C. Jan. 24, 2011) (finding that the "sporadic nature of Plaintiff's [a Black man] exposure to these offensive utterances," including being called "'boy'", "'black bastards'", and the reference by a company executive to a third party as a "'black motherfucker,'" did not "satisfy the "severity" requirement for a hostile work environment claim").

On the other hand, even "an 'isolated incident[ ]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The Fourth Circuit has said: "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.'" *Boyer-Liberto*, 786 F.3d at 278 (citation omitted)). For example, in *Boyer-Liberto*, the Fourth Circuit concluded that "a reasonable jury could find that [a manager's] two uses of the 'porch monkey' epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment." *Id.* at 280.

*Hines*, 2026 WL 776078, is instructive. In that case, plaintiff, an African American female, alleged, *id.* at *2 (internal citations omitted) (quoting the complaint):

> [Plaintiff's supervisor] once commented 'women can't do that,' when she was carrying a ladder at a job site. The Plaintiff also alleges that [her supervisor] expressed incredulity about a Black female being in the construction industry . . . In addition, the Plaintiff alleges that [her supervisor] told other . . . employees that her name was a 'black ghetto name.' . . . . The Plaintiff alleges that she asked [her supervisor] to refrain from such sexist and race-based humor and to treat her and other female and minority employees in a professional manner. But the Plaintiff alleges that [her supervisor's] 'disparagement and race and sex [-] based attacks continued.'

The *Hines* Court found that plaintiff's "complaint contains sufficient factual allegations to support" her claims of hostile work environment. *Id.* at *7. The court emphasized that, along with the specific incidents of offensive remarks plaintiff described in her complaint, "the aforementioned conduct is only an example of the ongoing comments made by" her supervisor. *Id.* at *10.

*Boykin*, 2023 WL 5488448, also provides guidance. There, plaintiff, an African American female, asserted that a "'colleague,' . . . took a picture of Plaintiff, circulated it to others, and described Plaintiff's hair as 'unprofessional and ghetto.' Plaintiff was wearing "'Senegalese twists, a natural [ ] hairstyle worn by some Africans and some African Americans.'" *Id.* at *1 (quoting the complaint). In addition, plaintiff alleged that she "reported" her colleague's "conduct to Defendant's Human Resources Department" but did not receive any protection, but rather was "'ostracized from the workplace and required to work remotely for a short period of time following her complaint.'" *Id.* Plaintiff also alleged that the same colleague aggressively confronted her. *Id.* Plaintiff claimed that after this colleague retired, plaintiff's supervisor, a white female, "subjected" her "to a 'series of discriminatory and retaliatory actions[.]'" *Id.* at *2 (quoting the complaint). Specifically, plaintiff alleged that her supervisor monitored her attendance closely and requested a response to a supposed complaint, actions she asserted were motivated by racial animus. *Id.* at *4.

The *Boykin* Court concluded that plaintiff's "generalized allegations that she was subjected to treatment different from Caucasians does not supply sufficient detail to permit the inference Plaintiff seeks." *Id.* Of relevance, the court noted that "use of the term 'ghetto,' without more, is not sufficient to show race-based behavior that is severe or pervasive." *Id.* Indeed, the court observed that a "one-time comment describing Plaintiff's hairstyle as 'unprofessional and ghetto'

falls short of the kind of severe or pervasive conduct necessary to establish a hostile work environment claim." *Id.* (citing cases).

Cato has alleged that on September 13, 2023, during a conversation at a "restaurant that is connected to the office," Flynn, the Regional Manager of Mission Rock, asked plaintiff if she was "'ghetto'", and told plaintiff that "the company does not tolerate 'ghetto people.'"   ECF 2, ¶ 10. Plaintiff was terminated about three months later.

To determine whether plaintiff has adequately pleaded a hostile work environment claim, the Court must consider the entire "constellation of surrounding circumstances, expectations, and relationships" in the workplace.  *Oncale*, 523 U.S. at 82.  Here, the offensive conversation took place at a restaurant "connected to the office." ECF 2, ¶ 10.  Notably, "allegedly offensive conduct that occurs *outside* of work mitigates the finding of severe conduct that creates an abusive working environment."  *Sodom v. Walmart Super Ctr.*, MJA-23-92, 2024 WL 4430532, at *3 (N.D.W. Va. June 4, 2024) (emphasis in original), *report and recommendation adopted,*  TSK-23-92, 2024 WL 4424793 (N.D.W. Va. Oct. 4, 2024), *reconsideration denied,* 2025 WL 2181704 (N.D.W. Va. Feb. 3, 2025).  Furthermore, as with the plaintiff in *Boykin*, 2023 WL 5488448, the use of the word "ghetto" on only one occasion does not amount to a workplace that is "'permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nnadozie*, 730 F. App'x at 158 (quoting *Harris,* 510 U.S. at 21).  And, as with the plaintiff in *Boykin,* 2023 WL 5488448, an allegation of increased monitoring of plaintiff, paired with an assertion that plaintiff was called "'ghetto'", is not sufficient to support a hostile work environment claim.  Plaintiff has not specified the race or sex of the other employees who were permitted to post pictures on Instagram.  *See id*.

The only sex-based comments plaintiff alleges are two comments by Hamilton: (1) the June 2023 remark, in which Hamilton told plaintiff that in Jamaica, plaintiff's "lifestyle was considered sinful, and she was 'going to hell' for her 'lifestyle,' referring to her gender identity and sexual orientation", ECF 2, ¶ 10; and (2) a comment in mid-October 2023 when Hamilton told Cato "certain tasks should be done by a man," *id.* ¶ 22.  All the other conduct plaintiff alleges regarding Cato and Hamilton, such as marking up Cato's emails with red ink, *id.* ¶ 15, or rescinding an offer to give plaintiff a ride to a company event, *id.* ¶ 21, smack of the personal slights and rudeness that can make a work environment unpleasant, but do not provide the basis for a hostile work environment claim.  *See Israelitt v. Enter. Servs. LLC*, SAG-18-1454, 2021 WL 795150, at *11 (D. Md. Mar. 2, 2021) ("[S]imple mistreatment or rude conduct does not suffice to support a hostile work environment claim."), *aff'd*, 78 F.4th 647 (4th Cir. 2023).  Indeed, "'mere rude or insensitive treatment cannot sustain a hostile work environment claim,' nor can 'sporadic rude language' or 'offhand comments.'"  *Nordan v. Wal-Mart Stores E. LP,* KAS-24-176, 2025 WL 2408545, at *5 (E.D.N.C. July 21, 2025) (quoting *Evans v. Capitol Broad. Co.*, 716 F. Supp. 3d 387, 403 (E.D.N.C. 2024)), *report and recommendation adopted,* REM-24-00176, 2025 WL 2405512 (E.D.N.C. Aug. 19, 2025).

Plaintiff has failed to state a claim of a hostile work environment on the basis of her sexual orientation, gender identity, or transgender status.  Accordingly, I shall dismiss plaintiff's claim of hostile work environment, without prejudice, and with leave to amend.

## IV.    Conclusion

For the foregoing reasons, I shall grant the Motion, without prejudice, and with leave to amend.  An Order follows.

Date: June 17, 2026

_____/s/_____

Ellen Lipton Hollander
United States District Judge
